## THE LUDDCO 41.

## LAKE UNION DRY DOCK & MACHINE WORKS v. WILMINGTON BOAT WORKS, Inc.

### No. 7012.

Circuit Court of Appeals, Ninth Circuit.
Sept. 16, 1933.

H. B. Jones, Robert E. Bronson, and Bronson, Jones & Bronson, all of Seattle, Wash., and McCutchen, Olney, Mannon & Greene, of Los Angeles, Cal., for appellant.

Lloyd S. Nix, of Los Angeles, Cal., for appellee.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

MACK, Circuit Judge.

From a decree against the Luddco 41 in favor of Wilmington Boat Works, Inc., libelant, claimant Lake Union Dry Dock & Machine Works appeals.

The Luddco 41 was constructed by appellant at Seattle, Wash., and on completion was shipped by it to the Yacht & Motor Sales Corporation, at Los Angeles, on consignment for purpose of sale. Sales Corporation was to use the boat only for demonstration runs and to defray the expenses of its upkeep until a sale was effected. While in possession of the Sales Corporation, the boat began to leak badly and its motor proved rather noisy. By order of the secretary-treasurer of Sales Corporation, it was brought to libelant's boat works in order that these defects might be remedied. There, various repairs and alterations in the vessel were from time to time ordered either by the secretary-treasurer or the service superintendent of Sales Corporation, partly at least for the purpose of pleasing a prospective purchaser. Appellant, having been informed by Sales Corporation that it had undertaken these alterations at its own expense, made no objection. The bill was sent to Sales Corporation, but, before it was paid, Sales Corporation went into bankruptcy. Thereupon a libel was filed against the vessel, and libelant was decreed to be entitled to a maritime lien under the Merchant Marine Act, the relevant provisions of which are set out in the margin.[1]

---

[1] "Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel." Act of 1920, c. 250, § 30, subsec. P, 41 Stat. 1005, 46 U. S. C. § 971 (46 USCA § 971).

"The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel." Act of 1920, c. 250, § 30, subsec. Q, 41 Stat. 1005, 46 U. S. C. § 972 (46 USCA § 972).

"The officers and agents of a vessel specified in subsection Q [section 972], shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." Act of 1920, c. 250, § 30, subsec. R, 41 Stat. 1005, 46 U. S. C. § 973 (46 USCA § 973).

998

The alterations which the libelant made on the vessel were "repairs" within the meaning of the act. The Harvard, 270 F. 668 (E. D. N. Y. 1920); New Bedford Dry Dock Co. v. Purdy, 258 U. S. 96, 42 S. Ct. 243, 66 L. Ed. 482 (1922). Appellant contends, however, that Sales Corporation was not a "person to whom the management of the vessel at the port of supply is intrusted" and that therefore, under the statute, it had no presumptive authority from the owner to bind the vessel for repairs. It is urged that it is but a broker to whom a vessel had been consigned for sale, and that such a consignee is no more within the statute than a contractor to whom the boat has been intrusted for repairs. Cf. The Juniata, 277 F. 438 (D. C. Md. 1922). There is, however, this decisive difference; while a contractor is not expected to use the boat, Sales Corporation admittedly had the right to operate this boat for demonstration purposes. For those runs, it would certainly need supplies and might need repairs; were there no agreement to the contrary, the parties might well have intended that these be procured at the expense of the owner and on the credit of the vessel. We are therefore satisfied that Sales Corporation comes within the statute as presumptively authorized by the owner to bind the vessel for repairs. It follows that libelant secured a lien unless Sales Corporation was in fact without such authority and unless libelant "knew or by exercise of reasonable diligence could have ascertained" this.

Appellant contends that Sales Corporation was without such authority because of the agreement that the upkeep of the vessel should be at the latter's expense; appellee urges that the agreement is no bar because these alteration repairs were not then contemplated by the parties. Assuming, without deciding, that the agreement did cover these repairs too, we concur in appellee's further contention that, under the controlling authorities, the lien has been validly created. Similar agreements in ship charters have been the subject of considerable litigation and some diverse interpretations. After the Ship Mortgage Act (46 USCA § 911 et seq.), in The South Coast Case, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386 (1920), a charter provision that the charterer was to pay all expenses of the voyage and save the owner harmless from liens, and that the owner might retake the vessel in case a lien was allowed to remain more than thirty days, was interpreted as not depriving the charterer of power to subject the vessel to liens. In some circuits, this decision has been narrowly interpreted to rest mainly on the clause recognizing that a lien might be created. A simple provision that the charterer must pay for fuel or other necessaries has accordingly been held sufficient to deprive him of authority to bind the vessel. The Cratheus, 263 F. 693 (C. C. A. 5th, 1920); Pensacola Shipping Co. v. United States Shipping Board Emergency Fleet Corporation, 277 F. 889 (C. C. A. 5th, 1922); The Mona, 282 F. 468 (C. C. A. 4th, 1922); The Dictator, 18 F.(2d) 131 (D. C. E. D. La. 1927); Henry W. Breyer, 17 F.(2d) 423 (D. C. Md. 1927); cf. The Ben Lawers, 42 F.(2d) 897 (D. C. W. D. Wash. 1930). In this circuit, however, the South Coast decision has been accepted as having a wider connotation. In The Golden Gate, 52 F.(2d) 397 (1931), cert. denied Knutsen v. Associated Oil Co., 284 U. S. 682, 52 S. Ct. 199, 76 L. Ed. 576 (1932), we held that a charter provision to the effect that the charterer shall provide and pay for fuel does not prevent the attachment of a lien for fuel ordered by the charterer or the ship's officers, in the absence of an express provision prohibiting the charterer from creating liens. U. S. v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361 (1923), was distinguished on the ground that there the charterer expressly agreed that it "would not 'suffer nor permit to be continued any lien.'" See, too, our decision in The Portland, 273 F. 401 (1921), and The Astorian, 57 F.(2d) 85 at page 90 (1932). The same views have been expressed in other circuits. The Anna E. Morse, 286 F. 794 (C. C. A. 3d, 1922); The Augusta W. Snow, 46 F.(2d) 992 (C. C. A. 1st, 1931); The J. W. Hennessy, 57 F.(2d) 77 (C. C. A. 2d, 1932). The oral agreement in the instant case that the upkeep of the claimant's boat was to be at the expense of the consignee is no stronger and therefore no more efficacious to prevent the lien than the above-recited provision in The Golden Gate.

As in the cases hereinabove referred to, there was here clearly no express prohibition in the agreement against the creation of a lien. Any inquiry that libelant might have made would therefore at best have advised it only that authority to create the lien was neither expressly given nor expressly withheld. In these circumstances the presumption of authority is not rebutted.

Affirmed.