### THE PAJALA.

### THE NUOLJA.

Nos. 13989, 14002.

District Court, E. D. New York.

June 29, 1934.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Ray Rood Allen and William J. Dean, both of New York City, of counsel), for libelant.

Haight, Smith, Griffin & Deming, of New York City (Wharton Poor, of New York City, of counsel), for claimant.

BYERS, District Judge.

These causes have to do with the furnishing of fuel oil by the libellant to the vessels named, under a contract with a time charterer, and the questions for determination are whether a lien existed, and if so, whether it has been lost. There are no contested issues of fact.

In the Pajala case the circumstances were these: On July 21, 1931, the ship was chartered in London by its owner (the claimant corporation) to Canadian-American Shipping Co., Ltd., apparently a Canadian corporation of Vancouver, B. C., on time charter (government form) and she continued thereunder until redelivery in England on February 6, 1932. Delivery under the charter was made as agreed at Colon, C. Z., on August 18, 1931. She proceeded thence to Vancouver, stopping at San Pedro for bunker oil, at the charterer's directions.

After a voyage to the Orient, the ship returned to Vancouver pursuant to the requirements of the charterer and proceeded thence to San Pedro, where bunkers were taken again, sufficient for a voyage through the Canal to England.

The Pajala's master was instructed in Vancouver by Captain Wilson, Marine Superintendent of the charterer, to procure enough bunker oil to do this and to have left in her tanks about 100 tons at redelivery.

The charter party contains the following:

The owner pays for provisions, wages, shipping and discharging fees; insurance of the vessel; all stores, and to maintain the vessel's class and keep the steamer in an efficient state in hull, machinery, etc.

The charterer "shall provide and pay for all the bunker oil, except as otherwise agreed," port and other usual expenses.

Charterer accepts bunker oil on board at delivery, and owners at redelivery, at agreed prices.

"30. Charterers to supply first-class Diesel oil of quality suitable for the vessel."

No other provisions of the document seem to bear upon this controversy.

The charterer had a contract dated September 30, 1929, with the libellant, which was in force until January, 1932, for the supply of fuel oil "for the operation of its (the charterer's) vessels owned, controlled or operated under charter," delivery to be at wharf, or barge or lighter, as stated, at various ports, including San Pedro.

The second taking of bunkers at San Pedro was completed on December 6, 1931, and 2,380.65 barrels of Diesel oil were delivered by barge or lighter at the contract price of $2,380.65. This was payable by the charterer, according to the contract, on January 10, 1932, and was billed accordingly. The only other efforts to collect the bill consisted in writing a letter requesting payment and the making of oral requests.

Bankruptcy proceedings against the charterer ensued in July of 1932, in Canada, and a trustee was appointed on the 21st of that month.

On September 23rd of that year, the ship being in Vancouver, this libellant instituted proceedings in the Exchequer Court of Canada, British Columbia Admiralty District, in which a writ of attachment was issued, the cause being entitled "Shell Oil Company, plaintiff, against The Motor Ship 'Pajala.'" The writ is in the King's name, and runs to the owners and all others interested in the motor ship "Pajala" and calls for appearance within one week, in default of which judgment may be given. The ship was attached under this writ, which recites by endorsement that the plaintiff claims $2,380.65 for necessaries supplied to the ship at the Port of Wilmington (the testimony shows this to be contiguous to San Pedro, the so-called port of Los Angeles, California,) on December 4, 1931, and for costs. There is attached to the writ an affidavit of the credit manager of this libellant, the plaintiff in that cause, which states what the endorsement shows, and that the national character of the ship is Swedish, and that no owner or part owner is domiciled in Canada.

This claimant appeared as owner, by a solicitor, on September 27, 1932, and filed a surety company bond in the sum of $3,500.00. Release under the seal of the court was issued to the Marshal of the Admiralty District on the following day. On October 27, 1932, the action was discontinued by consent, and two days later the bond was released.

The question presented by these facts is whether the libellant had a lien against the

ship when it filed its libel in this court on November 13, 1933. The lien is claimed to have come into existence on December 6, 1931, when the Diesel oil was delivered to the bunkers of the Pajala.

The only part that the master had in procuring the bunker oil was to radio the San Pedro agent of the charterer the probable hour of his arrival, so that the requisition of the charterer upon the libellant under the oil supply contract could be made the subject of timely delivery. The message read: "Dec. 4. Due Saturday night 330 tons disoil." And on the following day this: "Dec. 5. Due about midnight please arrange bunkering anchorage."

The fuel oil was necessary to enable the vessel to complete her voyage, and also to arrive at destination with enough oil in her tanks to enable the charterer to collect for that from the owner at the price stipulated in the charter-party. That price was believed to be favorable to the charterer. As has been stated, this was pursuant to the instructions of the charterer's Marine Superintendent in Vancouver.

The libellant relies upon the Federal Maritime Lien Act, 46 U. S. C. 971–973 (46 USCA §§ 971–973), and asserts that the owner, by the charter, charged the charterer with "the business of supplying the oil, and thus entrusted the management of the vessel at the port of supply to the charterers and their representatives."

The statute in section 972 makes it clear that among those presumed to have authority from the owner to procure supplies in addition to the master is "any person to whom the management of the vessel at the port of supply is intrusted * * *" but the following section, in explaining the foregoing, says: " * * * but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party * * * or for any other reason, the person ordering repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

In this case the supplier is chargeable with knowledge, for it could have inspected the charter-party upon request, that the charterer was discharging its own obligation, not that of the owner, in procuring the Diesel oil; not only that, it was buying enough to have on board at redelivery, a sufficient quantity to secure a profitable allowance therefor, as stipulated in that document.

This seems plain and must be so decided in view of The Thordis, 290 F. 255, 257, decided in this court in 1923 and not subsequently criticized by the Second Circuit Court of Appeals in the J. W. Hennessy, 57 F.(2d) 77. The latter dealt with a demise charter and a lien for towage, not a time charter and a lien for supplies.

With respect to the latter, the Supreme Court has said (Marshall & Co. v. President Arthur, 279 U. S. 564, at page 568, 49 S. Ct. 420, 421, 73 L. Ed. 846) referring to maritime liens: "Such liens differ in their character and are not equally favored—the lien for necessaries, which is a secret one, being stricti juris, Piedmont Coal Co. v. Seaboard Fisheries Co., supra [254 U. S. 1, 12, 41 S. Ct. 1, 65 L. Ed. 97]."

In the same case the court made it clear, citing the same authority, that the act respecting maritime liens did away with the earlier artificial distinction between the creation of a lien for necessaries when furnished to a vessel in a foreign port and the denial of a lien when furnished in a domestic port and substituted "a single federal statute for the state statutes in so far as they confer liens for repairs, supplies and other necessaries." Further the opinion states: "To this end the Act gave a maritime lien on any vessel, whether foreign or domestic, for necessaries furnished on the order of the owner or his authorized agent, and relieved the libellant from the necessity of alleging or proving that credit was given to the vessel. The Committee reports show, however, that it was not intended to make any other change in the general principles of the existing law of maritime liens, Piedmont Coal Co. v. Seaboard Fisheries Co., supra."

It is true that the foregoing was written in a case in which the court was called upon to decide whether a lien had been waived which would have existed under usual circumstances, and the determination was of that question. However, the court's observations concerning the purpose accomplished by the statute, and the extent to which the law as it was prior to 1910 had been affected by the Maritime Lien Act of 1910 (36 Stat. 604), and the Ship Mortgage Act of 1920 (the statute here involved) constitute such a commentary upon the subject as to impose the duty upon this court of conforming its conclusions thereto.

Under circumstances not to be distinguished from those here involved, Judge Campbell wrote in The Thordis, supra, after holding that The South Coast, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386, and The Portland (C.

C. A.) 273 F. 401, were not controlling: "The claimant in support of its contention cites The Kate, 164 U. S. 458, 17 S. Ct. 135, 41 L. Ed. 512— * * * all of which cases seem to hold that if the libelants at the time knew, or by such diligence as good faith required could have ascertained, that the party upon whose order they were furnished was without authority from the owner to obtain supplies or have repairs made on the credit of the vessel, but had undertaken as between itself and the owner to provide and pay for such supplies and repairs, they could have no lien."

If the statement quoted from the opinion in Marshall & Co. v. The President Arthur, correctly sets forth the scope and reach of the applicable statute, then the law as laid down in The Kate, supra, has not been changed so far as a time charterer is concerned, and this libellant, as the libellant in The Thordis, can have no lien. The Golden Gate (C. C. A.) 52 F.(2d) 397, certiorari denied Knutsen v. Associated Oil Co., 284 U. S. 682, 52 S. Ct. 199, 76 L. Ed. 576, and The Luddco 41 (C. C. A.) 66 F.(2d) 997 have been examined along with many other cases which have been cited by both counsel. These two are decisions of the Ninth Circuit, and the former was cited with approval in The J. W. Hennessy, supra, as following The South Coast, supra. The latter also involved a demise charter, in which it was found that liens might be imposed by the charterer and allowed to stand for less than a month. The distinction between a demise charterer, namely, an owner pro hac vice, and a time charterer, seems to be of the essence in this controversy.

He who is the owner for the time being may impose a lien on the vessel. He who is merely operating under a contract which in plain terms imposes upon him the duty of furnishing fuel for the ship does not stand in the place of the owner, even temporarily, and the supplier is required by the statute to exercise reasonable diligence to inform himself of the difference.

The choice of following the law as announced in this court, rather than the two decisions in the Ninth Circuit, is deliberate and in the belief that correction, if it be appropriate, lies elsewhere.

This libellant sold the fuel oil in question in reliance upon and pursuant to a contract with the time charterer, not upon the credit of the vessel, and the attempted assertion of a lien was a long afterthought. Indeed, the Pajala was in Baltimore for two days in March of 1932, and in Tampa for a like peri-od during the same month; in Baltimore for two days in May, and again in Tampa for two days later in the same month; and in Baltimore four days in August, and in the Panama Canal in September, without any attempt being made to libel her. The proceedings in Canada during September of 1932 have been described.

In the view here taken, there was no lien in favor of the libellant in this cause, and it becomes unnecessary to discuss whether, if there had been one, it was waived; or if not, whether the proceedings in Canada resulted in transferring the lien to the bond, which was released upon consent.

In the Nuolja case, there were no proceedings in Canada in behalf of the asserted lien, but otherwise the facts are parallel. The only differences to be observed are (a) that in the latter case the chief engineer apparently signed a receipt for the oil on board at San Pedro. Perhaps the same is true as to the Pajala, but in both cases the master did not order or purchase the oil, nor did anyone else acting for and on his behalf, or that of the owner. (b) The Nuolja was not in any port of the United States after passing through the Canal eastbound, and the occasion of her being libeled in this case.

The claimants may take a decree, dismissing the libels with one bill of costs, to be settled on notice.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals as to ownership and incorporation.