DAMPSKIBSSELSKABET DANNEBROG, CLAIM-
ANT, ET AL. *v.* SIGNAL OIL & GAS CO. OF
CALIFORNIA.

No. 662.   Argued April 1, 1940.—Decided May 20, 1940.

*Mr. Lane Summers,* with whom *Messrs. W. H. Hayden* and *F. T. Merritt* were on the brief, for petitioners.

*Mr. Glenn J. Fairbrook* for respondent.

Mr. Chief Justice Hughes delivered the opinion of the Court.

The question is whether the respondent is entitled to maritime liens for fuel oil delivered to petitioners' vessels.

In September, 1932, respondent, Signal Oil and Gas Company, made a contract with the Anglo Canadian Shipping Company, Limited, agreeing to sell fuel oil to any vessel which the Anglo Canadian Company might own, charter or operate. In May, 1933, the parties modified the contract so as to include the fuel oil requirements of vessels owned, chartered or operated by W. L. Comyn & Sons. Later, the respective owners of the two vessels here in question, the "Stjerneborg" and the "Brand," chartered them to W. L. Comyn & Sons.

The charters were time charters on the so-called "Government form." The owners agreed "to let" and the charterers "to hire" the vessel "from the time of delivery" for a specified period, the vessel to be placed "at the disposal of the charterers" at such place as the charterers may direct, being on her delivery ready to receive cargo and to be employed in carrying merchandise as stated. The owners agreed to provide and pay for all provisions, wages and shipping and discharging fees of the captain, officers, engineers, firemen and crew; to pay for the insurance of the vessel, and to maintain her in a thoroughly efficient state in hull, machinery and equipment. The charterers agreed to "provide and pay for" coals and fuel oil, port charges, pilotages, etc., and all other usual ex-

penses except as before stated. The charterers were to pay "for the use and hire" of the vessel a stipulated amount commencing "on and from the day of her delivery" and to continue until "the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the owners (unless lost) at a safe port" as designated. It was provided that the captain, although appointed by the owners, should be "under the orders and direction of the charterers as regards employment or agency"; and the charterers were to load, stow and trim the cargo at their expense under the supervision of the captain. If the charterers should have reason to be dissatisfied with the conduct of the captain, officers or engineers, the owners if necessary should make a change in the appointments. The charterers were allowed to appoint a supercargo to accompany the vessel and "see that voyages are prosecuted with the utmost despatch." It was further provided that nothing in the charter should be construed as a "demise" and that the owners were to remain responsible for the navigation of the vessel. The charters contained no prohibition against the creation of liens for necessary supplies ordered by the charterers.

Respondent libeled the vessels for fuel oil supplied to the vessels respectively on the charterers' order, and the owners appeared and filed answers alleging that the oil was furnished upon the charterers' credit and not upon that of the vessel.

The District Court sustained the liens, 25 Fed. Supp. 594, and the Circuit Court of Appeals affirmed the decrees. 106 F. 2d 896. Because of an alleged conflict with decisions of the Circuit Court of Appeals of the Fifth Circuit in *The Cratheus,* 263 F. 693, and *Pensacola Shipping Co.* v. *United States Shipping Board,* 277 F. 889, certiorari was granted, 309 U. S. 644.

The Circuit Court of Appeals in the instant case followed its decisions in *The Portland,* 273 F. 401, and *The*

*Golden Gate,* 52 F. 2d 397.   *The Golden Gate* was a case of a time charter which required the charterer to provide and pay for fuel oil but contained no provision denying the right of the charterer to bind the ship for necessary supplies.   The court said that in the absence of such a prohibition the ship was bound whether the supplies were ordered by the charterer or by the master.   The ruling was reiterated by the same court in *The Luddco,* 66 F. 2d 997, 998.   In further support of its position, respondent cites the following cases from other circuits:   *The Everosa,* C. C. A. 1st, 93 F. 2d 732, 735; *The J. W. Hennessy,* C. C. A. 2d, 57 F. 2d 77, 79, 80;   *The Anna E. Morse,* C. C. A. 3d, 286 F. 794, 798; *Munson Inland Water Lines* v. *Seidl,* C. C. A. 7th, 71 F. 2d 791, 793.

Petitioners rely upon our decisions in *The Kate,* 164 U. S. 458, 464, and *The Valencia,* 165 U. S. 264, to the effect that where the charter party requires the charterer to provide and pay for supplies, the supplier being charged with knowledge of the provisions of the charter party was not entitled to a maritime lien for supplies furnished to the vessel upon the order of the charterer.

These decisions, however, were prior to the passage of the Act of June 23, 1910, 36 Stat. 604, which governs the present case.   The text of the Act, as amended, is set forth in the margin.[1]   Its purpose was to simplify and

---

[1] The Act of June 23, 1910, 36 Stat. 604, as amended by the Act of June 5, 1920, § 30, 41 Stat. 1005, 46 U. S. C. 971–973, provides:

" § 971.   *Persons entitled to lien.*   Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in

clarify the rules as to maritime liens as to which there had been much confusion. The Act did away with the artificial distinction between repairs, supplies, etc., furnished in home ports and those furnished in foreign ports. It did away with the doctrine that when the owner of a vessel contracted in person for necessaries or was present in the port when they were ordered, it was presumed that the material-man did not intend to rely upon the vessel's credit. It substituted a federal statute for numerous state statutes purporting to confer liens. *Piedmont Coal Co.* v. *Seaboard Fisheries Co.,* 254 U. S. 1, 11.[2]

In so doing, the statute provided a series of simple and comprehensive rules. While it was said not to be intended to change the general principles of the law of maritime

---

rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

" § 972. *Persons authorized to procure repairs, supplies, and necessaries.* The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel.

"§ 973. *Notice to person furnishing repairs, supplies, and necessaries.* The officers and agents of a vessel specified in section 972, shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

Other provisions, §§ 974 and 975, relate to the waiver of liens and the superseding of state laws.

[2] See, also, *The Yankee,* 233 F. 919, 924; *The Oceana,* 244 F. 80, 82; Senate Report, No. 831, 61st Cong., 2d sess.; House Report, No. 772, 61st Cong., 2d sess.

liens,[3] it was intended to operate in aid of those who supply necessaries to ships and it correspondingly restricted the rights of the owners of the vessels. Any person furnishing repairs, supplies, etc., to a vessel whether foreign or domestic, "upon the order of the owner" or "of a person authorized by the owner," is to have a maritime lien which may be enforced by suit *in rem*. It is not necessary to allege or prove that credit was given to the vessel. The "managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted," is presumed to have authority to procure the necessaries. The officers and agents thus specified include those appointed "by a charterer, by an owner *pro hac vice*, or by an agreed purchaser in possession of the vessel." These broad provisions are then subjected to the qualification that nothing in the Act should be construed to confer a lien "when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

Despite the aim thus to provide simple and clear rules, there has been no little contrariety of opinion in the application of the statute,—well illustrated by the conflicting decisions to which we have referred with respect to the existence of maritime liens where supplies have been ordered by a charterer who has agreed with the owner to provide and pay for them. As, in such a case, the supplies are furnished on the charterer's order, there is no question that the supplier is charged with knowledge of the provisions of the charter when he either knows them

---

[3] Senate Report, No. 831, 61st Cong., 1st sess. *Marshall & Co.* v. *The President Arthur*, 279 U. S. 564, 568.

or by reasonable diligence could have ascertained them. So far, the principle of *The Kate* and *The Valencia, supra,* is embodied in the statute. But it does not follow that, in the light of the statute, *The Kate* and *The Valencia* can still be regarded as authority for the view that the mere fact that the charterer is bound to provide and pay for the supplies excludes the supplier from having a maritime lien when the charter party contains no prohibition against its creation.

We think that our decision in *The South Coast,* 251 U. S. 519,[4] negatives such a conclusion. That was a case of a bare-boat charter which provided that the charterer should pay for all supplies and all other charges and save the owner harmless from all liens. The supplies were ordered by the master, but, though appointed by the owner, the master was under the orders of the charterer and thus the master's orders were the charterer's orders. When the supplies were ordered, representatives of the owner at the port of supply warned the supplier that the vessel was under charter and that he must not furnish the supplies on the credit of the vessel. If the owner had power to prevent the attaching of a lien by this warning, the owner had done so. But while under the terms of the charter party it was clearly the duty of the charterer to provide and pay for the supplies and to save the owner harmless, this was held not to preclude the creation of a maritime lien. *The Kate* and *The Valencia* were cited unavailingly. When the charter party was examined to see if it prohibited liens it was found that it did not do so; it recognized the possibility of liens. It provided that the owner might retake the vessel in case of the failure of the charterer to discharge within thirty days any debt which was a lien upon it and also for a surrender of the

---

[4] The facts are more fully set forth in the opinion of the Circuit Court of Appeals. *The South Coast,* 247 F. 84.

vessel free of liens upon the charterer's failure to make certain payments.

We think that the fair import of our decision in *The South Coast* is that when the charterer has the direction and control of the vessel and it is his business to provide necessary supplies, and the charter party does not prohibit the creation of a maritime lien therefor, the material-man is entitled to furnish the supplies upon the credit of the vessel as well as upon that of the charterer and the lien is not defeated by the fact that the charterer has promised the owner to pay.

When, however, the charter party, with knowledge of which the material-man is charged, prohibits the creation of a lien for supplies ordered by the charterer or the charterer's representative, no lien will attach. This was decided in *United States* v. *Carver,* 260 U. S. 482. That was a case of vessels owned by the United States. The charterer, whose representative had ordered the supplies, had agreed that it would "not suffer nor permit any lien" which might have priority over the title and interest of the owner. The question was whether a maritime lien would have arisen against the vessels if they had been privately owned. The court, quoting the provision of the Act of 1910 as to the duty of the material-man to make inquiry, said that he was not entitled "to rest upon presumptions until he is put upon inquiry"; he must inquire. "If by investigation with reasonable diligence the material-man could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms." The court added that there would have been no difficulty in finding out both. The court found a difference between the language of the charter party in the *Carver* case and that used in *The South*

*Coast.* In the *Carver* case "the primary undertaking" was that "a lien shall not be imposed." The lien was denied, not because the charterer was bound to provide and pay for supplies, but because the charter party prohibited the lien. To the same effect is the decision in the case of *The St. John's. Colonial Beach Co.* v. *Quemahoning Coal Co.,* 260 U. S. 707.

As, in the instant case, the charter parties contained no provision prohibiting the creation of a maritime lien, we are of the opinion that the mere fact that they required the charterers to provide and pay for the supplies did not prevent the liens from attaching.

The argument is pressed that respondent was under a general contract to supply "the fuel oil requirements of any and all vessels owned, chartered, or operated" by W. L. Comyn & Sons. But this contract did not provide that the oil should be supplied on the sole credit of Comyn as the owner or charterer of the vessels or negative the creation of maritime liens for supplies actually furnished to the vessels in satisfying their requirements. The decisions which petitioner cites are not apposite. In *Piedmont Coal Co.* v. *Seaboard Fisheries Co., supra,* the Coal Company had made a contract with a corporation, which owned both steamers and factories, to furnish such coal as should be required. The court observed that the difficulty which confronted the Coal Company in seeking to enforce a maritime lien did not lie in the fact that a contract had been made for the supply of coal. "A vessel," said the court, "may be liable *in rem* for supplies, although the owner can be made liable therefor *in personam;* since the dealer may rely upon the credit of both." So, the court recognized that if in that case "the coal had been furnished to the several vessels by the libellant, maritime liens would have arisen and could have been established under the statute without

proof that credit was given to the vessels." The difficulty which blocked recovery by the Coal Company was "solely that it did not furnish coal to the vessels." There "was no understanding when the contract was made, or when the coal was delivered by the libellant, that any part of it was for any particular vessel or even for the vessels then composing the fleet. And it was clearly understood that the purchasing corporation would apply part of the coal to a non-maritime use." *Id.*, pp. 10, 11, 13. In the instant case, the oil was supplied exclusively for the vessels in question, was delivered directly to the vessels and was so invoiced; and there was nothing in the general contract to the effect that the supplies were to be furnished upon the exclusive credit of W. L. Comyn & Sons and not also upon the credit of the vessels.

In the other case relied upon, *Marshall & Co.* v. *The President Arthur*, 279 U. S. 564, the point was that the maritime lien had been waived by the libellant under an agreement by which trade acceptances endorsed by designated persons had been received; that "by taking other and different security, upon which it relied, and which it still retains, without stipulating for the retention of the lien, it has waived the lien which it otherwise would have had." *Id.*, p. 572. It may be noted that in the instant case there was a contention that the liens had been waived by the respondent by entering into a certain creditor's agreement and by accepting certain security. But it appeared that in those transactions the right to the liens on the vessels had been expressly reserved. The court below accordingly ruled that there had been no waiver and its decision in that relation has not been challenged here.

There remains the contention that, apart from any prohibition of the creation of liens, the vessels could not be bound for supplies ordered by the charterers because of

the nature of the charter parties. There is a plain distinction between a case of a bare-boat charter, where the charterer mans the vessel, and a case where the charter party is a mere contract for the carriage of goods. In the former there is a clear demise; in the latter, the charterer is in substance only a shipper.[5] There is an intermediate class of charters which has given rise to many questions in various situations. Time charters of the sort now before us are in this class. The owner provides the master and crew and undertakes the navigation of the vessel and to maintain her in an efficient condition. But the master although appointed by the owner, is placed "under the orders and direction of the charterers as regards employment or agency." The owners agree "to let" the vessel and the charterers "to hire" her "from the time of delivery" until the date set for "her redelivery." The charterers are to provide and pay for fuel supplies, port charges, pilotages, etc. and all other expenses except those pertaining to the captain, officers or crew.

There is thus a distribution of responsibility, and liability or the legal consequences of particular conduct would be determined accordingly. While the owners assumed responsibility for the navigation of the vessels and their maintenance in an efficient state, we are not concerned with any questions relating to faults in navigation or failure in maintenance. The mere fact that the owners furnished the master and crew cannot be regarded as decisive of the question before us. See *United States* v. *Shea,* 152 U. S. 178, 190, 191; *United States* v. *Cornell Steamboat Co.,* 267 U. S. 281. Aside from the navigation of the vessels, they were placed under the control of the

---

[5] See *Reed* v. *United States,* 11 Wall. 591, 600; *Leary* v. *United States,* 14 Wall. 607, 610; *United States* v. *Shea,* 152 U. S. 178, 189–191; *The Barnstable,* 181 U. S. 464, 468.

charterers and the master and crew were under their directions. The vessels by the terms of the charters were delivered to the charterers, and where the vessels were to go and what they were to carry, within the broad limits described in the charters, were determined by the charterers.

The question whether under a charter, containing these or similar provisions, the material-man may have a lien for supplies furnished on the order of the charterer has given rise to conflicting views [6] and no little confusion has resulted.

We think that this conflict may be resolved by having due regard to the manifest purpose of the governing statute. The Act says nothing about types of charters. In speaking of those who shall be presumed to have authority to procure supplies, the statute expressly includes not only the "ship's husband" and the "master" but "any person to whom the management of the vessel at the port of supply is intrusted," and these persons are to be taken to include such officers and agents "when appointed by a charterer, by an owner *pro hac vice,* or by an agreed purchaser in possession of the vessel." We think that the purpose of the statute is not properly served by construing the term "management of the vessel" as referring to her "navigation." Management is a broader term connoting direction and control for the purposes for which the vessel is used. Where, as in this

---

[6] See, e. g., upholding the lien; *The India,* 14 F. 476, 16 F. 262; *The Bombay,* 38 F. 512, 863; *The George Dumois,* 68 F. 926; *The Anna E. Morse,* 286 F. 794; *The A. S. Sherman,* 51 F. 2d 782; *The Golden Gate,* 52 F. 2d 397; *The Everosa,* 93 F. 2d 732. See, e. g., contra: *The Cratheus,* 263 F. 693; *Pensacola Shipping Co.* v. *U. S. Shipping Board,* 277 F. 889; *The Thordis,* 290 F. 255; *The Ville de Djibouti,* 295 F. 869; *The Pajala,* 7 F. Supp. 618; *The Dictator,* 18 F. 2d 131. Compare, *The J. W. Hennessy,* 57 F. 2d 77, 80.

case, apart from mere navigation, the vessel is placed under the direction and control of the charterer as the hirer of the vessel, who as such may determine to what port she shall go and what she shall carry, subject only to specified exceptions, we think the charterer must be deemed to be intrusted with the vessel's management for the purpose of applying the statutory test of authority to obtain necessary supplies upon the credit of the vessel, in the absence of a provision to the contrary.

The origin of the maritime lien is the need of the ship. *Piedmont Coal Co.* v. *Seaboard Fisheries Co., supra.* The lien is given for supplies which are necessary to keep the ship going. The material-man when furnishing such supplies on the order of the charterer is charged with knowledge of the terms of the charter party when he can ascertain them, but when it appears that by these terms the charterer has direction and control of the vessel and that he is the one to obtain the essential supplies, and that there is no prohibition of the creation of a maritime lien, the material-man is protected by the terms of the statute. He furnishes the supplies on the order of the person authorized to obtain them and he is entitled to rely on the credit of the vessel as well as upon the credit of the one who gives the order.

We are of the opinion that it would thwart the purpose of the statute to compel the material-man furnishing supplies to the vessel to resolve the ambiguities which may be found in such charters as those here involved. The statute was intended to afford the material-man a reasonably certain criterion. The owner has a simple and ready means of protection. All that it is necessary for him to do, as the material-man in dealing with the charterer is charged with notice of the charter, is to provide therein that the creation of maritime liens is prohibited. When the owner does not do so, he should not be heard to complain when it appears that it is the

281

charterer's business to obtain supplies to keep the vessel on her way and the charter has not prohibited reliance upon the credit of the vessel.

The judgment of the Circuit Court of Appeals is

*Affirmed.*