**Rodney H. DANN, Libellant,**

v.

**The DREDGE SANDPIPER, Respondent.**

**No. 1856.**

United States District Court
D. Delaware.

Oct. 22, 1963.

Joseph J. Longobardi, Jr., of Longobardi & Schwartz, Wilmington, Del., for libellant.

Edmund N. Carpenter, II, and William E. Wiggin, of Richards, Layton & Finger, Wilmington, Del., and Alexander Harvey, II, of Ober, Williams, Grimes & Stinson, Baltimore, Md., for claimant and respondent.

CALEB M. WRIGHT, Chief Judge.

Libellant asserts a lien upon the dredge Sandpiper pursuant to the provisions of the Maritime Lien Act, 46 U.S. C.A. §§ 971–975. Claimant, the owner of the dredge, counters that the services which gave rise to the lien were rendered to a charterer of the dredge. The terms of the charter prohibit such a lien and claimant contends that this prohibition in the charter suffices to defeat the lien. He moves for a summary judgment.

The Sandpiper is owned by Ellicott Machine Corporation. On March 28, 1962, Ellicott entered into an agreement whereby it leased the dredge to Dredging Construction Corporation. The term of the lease was ten years from the date of delivery, which occurred in April, 1962.

For a time, Dredging used the Sandpiper in the Potomac River. In October, 1962 the lessee engaged Rodney H. Dann, the libellant, to tow the dredge through the Chesapeake Bay and the Chesapeake and Delaware Canal to Wilmington, Delaware. The agreed price for towing was $1600.

When the dredge arrived in Wilmington it was dismantled and was reassembled on an inland pond where it was used in connection with construction of a new highway. On May 28, 1963, Ellicott repossessed the dredge under the terms of its lease agreement because of the nonpayment of rent. On the following day, the Sandpiper was attached at the instance of Dann who asserts a maritime lien for the amount of his towing charges.

Before the merits of the case can be decided, an interesting jurisdictional question is presented. The dredge has been removed from navigable waters and reassembled on an inland pond. While it was engaged in dredging fill at this landlocked location, the Chief Deputy United States Marshal attached the Sandpiper under process issued by this court. The question thus arises as to whether or not the admiralty jurisdiction of the United States District Court extends to the dredge in its landlocked circumstances.

Under Article III of the Constitution, the judicial power of the United States extends "to all Cases of admiralty and maritime Jurisdiction." Congress has given to the district courts, exclusive of the courts of the states, jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C.A. § 1333.

Congress has defined the admiralty jurisdiction in terms of maritime matters. Claimant maintains that maritime matters are in turn defined by the navigable nature of the waters where an occurrence takes place and by the involvement in that occurrence of a vessel, its cargo or personnel.

Certainly "maritime" occurrences are connected with the sea. However, the jurisdiction of the district courts sitting in admiralty has always been broader than was the jurisdiction of the English Admiralty Court at the time our Constitution was adopted. The English model rejected in the early years of our own judicial system followed a strict locality test. In matters of contract, for example, the English rule, with some exceptions, conceded admiralty jurisdiction only to contracts made and to be performed upon navigable waters. Benedict on Admiralty (6 ed. Knauth) § 62.

The United States courts early steered a course to broader admiralty jurisdiction. According to Story, the jurisdiction,

"[C]omprehends all maritime contracts, torts, and injuries. The latter branch is necessarily bounded by locality; the former extends over all

contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the navigation, business or commerce of the sea." De-Lovio v. Boit, 7 Fed.Cas. 418 at 444, No. 3776 (1815).

In Stevens v. The Sandwich decided in 1801, the court said,

"By the judiciary act the district court has exclusive original jurisdiction of all civil causes of admiralty and maritime cognizance. And it is somewhat remarkable that neither this act, nor the constitution which it follows, limit the jurisdiction in any respect as to place. It is bounded only by the nature of the causes over which it is to decide. * * *" Stevens v. The Sandwich, 23 Fed. Cas. 29 at 30, No. 13,409 (1801).

■ Thus, maritime matters are not literally controlled by reference to vessels and to navigable waters. Just as the status of a structure as a ship is not determined by its size or rigging but by its purpose, Benedict, supra, § 53, so the existence of maritime jurisdiction is determined in a contract action by the nature of the services rendered.

A dredge may have the characteristics of a vessel, may be located in navigable waters, and still not be within the cognizance of the admiralty jurisdiction. In J. C. Penney-Gwinn Corp. v. McArdle, 27 F.2d 324, 59 A.L.R. 1342 (5 Cir. 1928) cert. den. Lancaster Iron Works v. J. C. Penney-Gwinn Corp., 278 U.S. 632, 49 S.Ct. 31, 73 L.Ed. 512 (1928), a dredge located in Biscayne Bay was engaged in filling land by pumping sand from the bottom of the bay. Maritime liens were claimed for supplies furnished the dredge while engaged in that venture. It was held that an action in admiralty could not be maintained. "It is essential", the court said, "in order to maintain an admiralty lien on a vessel for supplies or advances, that she be at the time engaged in a maritime venture." J. C. Penney-Gwinn Corp. v. McArdle, supra, 27 F.2d

at 325. See also In re Hydraulic Steam Dredge No. 1, 80 F. 545 (7 Cir. 1897). In every case, then, the formula of vessel plus navigable waters will not provide the acid test.

Still to be determined in the question of jurisdiction, is the time at which admiralty jurisdiction is to be measured. Claimant claims that the Court must focus on the facts at the time the Sandpiper was seized by the Marshal in a landlocked pond.

■ We have seen that the existence of admiralty jurisdiction depends on the nature of the transaction. The objection that, on the merits, no lien exists is not jurisdictional. A court with power over the res may determine whether or not a maritime lien exists. The Resolute, 168 U.S. 437, 18 S.Ct. 112, 42 L.Ed. 533 (1897). See Gilmore and Black, The Law of Admiralty, § 1–12.

The transaction out of which the lien asserted in this case arose was the towage of Sandpiper up the Chesapeake Bay and through the canal. It is at that time, the time at which the alleged maritime service was rendered, which the Court must focus to determine jurisdiction.

This principle is illustrated by two cases involving ships which were secured to the land and used as eating places. In Hayford v. Doussony, 32 F.2d 605 (5 Cir. 1929), certain "mariners" filed a libel in admiralty against the Pirate Ship. Their claim arose out of the alleged non-payment of wages. These wages were earned while the ship was attached to the Canal Street dock. The mariners were in fact waiters and had never been to sea in the Pirate Ship. The Court held that as a result of the ship not being a "vessel or instrument of navigation or commerce engaged in any maritime venture", a maritime lien would not attach

In Arques Shipyards v. The S.S. Charles Van Damme, 175 F.Supp. 871 (D.C.N.D.Cal.S.D.1959), libellant alleged a maritime lien for wharfage,

berthage, towage and other services. The exceptions to the libel challenged the jurisdiction of the court on the ground that the ship had been used as a restaurant since December 1, 1957. The Court responded that admiralty jurisdiction does not depend on the classification of the ship when used as a restaurant but rather on (1) whether the services and materials furnished were capable of giving rise to a maritime lien, or (2), the ship's status at such time.

> "Libelant's affidavit states that the maritime lien is based on materials and services furnished prior to December 1, 1957. If this is so, then such period is the crucial time for testing admiralty jurisdiction. The question of respondent's status when in use as a restaurant would be immaterial except in so far as the nature of the services and materials related to such use. If a maritime lien arose at the time such services and materials were furnished it seems clear that a Court of Admiralty could not be ousted from jurisdiction by subsequent changes in the character of the respondent S.S. Charles Van Damme. * * * " Arques Shipyards v. S.S. Charles Van Damme, supra, 175 F.Supp. at 872. See also United States v. The Zarco, 187 F.Supp. 371 (D.C.S.D.Cal.S.D. 1960).

█ The admiralty jurisdiction of this court is properly invoked. The towage of the Sandpiper to Wilmington was clearly a maritime undertaking. See

Benedict, supra, § 100. The subsequent removal of the dredge to a pond a few miles inland does not divest this court of its jurisdiction.

The libellant claims a lien against the Sandpiper for towage pursuant to Section 1 of the Maritime Lien Act, 46 U.S. C.A. § 971.[1] The statute permits a lien for towage when that service is engaged by a person authorized by the owner of the vessel. "Person authorized" by the owner is defined in 46 U.S.C.A. § 972.[2]

46 U.S.C.A. § 973 places a limitation on the furnisher of repairs, supplies, or necessaries in asserting his lien.

> "§ 973. Notice to person furnishing repairs, supplies, and necessaries

> "The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor. June 5, 1920, c. 250, § 30, Subsec. R, 41 Stat. 1005."

At the outset, libellant claims that the duty of reasonable inquiry announced in this statute does not apply to him, be-

---

1. "§ 971. Persons entitled to lien
   "Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel. June 5, 1920, c. 250, § 30, Subsec. P, 41 Stat. 1005."

2. "§ 972. Persons authorized to procure repairs, supplies and necessaries
   "The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel. June 5, 1920, c. 250, § 30, Subsec. Q, 41 Stat. 1005."

cause towage is not included in "repairs, supplies, and necessaries." Therefore, argues libellant, it was not incumbent upon him to attempt to discover the charter agreement.

This very question was raised in the recent case of Diaz v. S.S. Seathunder, 191 F.Supp. 807 (D.C.Md.1961). There it was contended that furnishers of towage were not required to make inquiry pursuant to Section 973 because the word "towage" was not included in the statute. The Court rejected this contention and held that towage and pilotage are "clearly included within the meaning of 'necessaries' as that term is used in section 973." Diaz v. S.S. Seathunder, supra, 191 F.Supp. at 826. See also The Western Wave, 77 F.2d 695 (5 Cir. 1935) for a short history of the status of towage under § 973.

■ By the terms of Section 973, libellant is charged with knowledge of the charter which in this case, prohibited the charterer from incurring charges against the Sandpiper, if he "knew, or by exercise of reasonable diligence could have ascertained" the terms of the charter. If Dann knew, or could have ascertained those terms, his rights under §§ 971 and 972 are qualified by § 973 and no lien arises. United States v. Carver, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361 (1923).

In construing Section 973 in the Carver case, the Supreme Court said,

"We regard these words as too plain for argument. They do not allow the materialman to rest upon presumptions until he is put upon inquiry, they call upon him to inquire. * * *" United States v. Carver, supra, 260 U.S. at 489, 43 S.Ct. at 182, 67 L.Ed. 361.

In Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co. of California, 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940), the Supreme Court reiterated its Carver position.

"When, however, the charter party, with knowledge of which the ma-terialman is charged, prohibits the creation of a lien for supplies ordered by the charterer or the charterer's representative, no lien will attach. * * *" Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., supra, 310 U.S. at 275, 60 S.Ct. at 941, 84 L.Ed. 1197.

The Court then went on to quote the Carver ruling on inquiry.

■ It is clear then, that a furnisher of supplies or services cannot obtain a lien under the Maritime Lien Act when he knows that a charter is in existence which prohibits the charterer from creating a lien. Also clear is the fact that the material-man is charged with notice of the charter terms if he knew of the charter or could have discovered its existence through reasonable investigation. The owner can protect himself from charges incurred by the supplier who knows of the charter or could have known of it by reasonable inquiry through the simple medium of a charter clause prohibiting the charterer from incurring liens. See Gilmore and Black, supra, § 9–45.

One variation remains, however. Where the furnisher of services did enter upon a reasonable investigation and was unable to discover the existence of the charter, he does not fall within the language of the Carver case. See Gilmore and Black, supra, §§ 9–45, 9–46. The libellant, Rodney H. Dann, claims to have exercised reasonable diligence in an effort to uncover any charter agreement in his negotiations with Dredging.

■ Whether or not the libellant could have discovered the charter by the exercise of reasonable diligence presents a material question of fact. Lindbar, Incorporated v. St. Louis Fuel & Supply Company, 276 F.2d 882 (6 Cir. 1960). This cannot be resolved on a motion for summary judgment. United States v. Diebold, Incorporated, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Southern Rail and Equipment Co. v. Midwest Mfg. & Plating Co., 178 F.2d 390 (7 Cir.

1949); 6 Moore's Federal Practice § 56.04, et seq.

The claimant's motion for summary judgment is therefore denied. The libellant shall present an order in accordance herewith.