Adolph **AJUBITA** and A. W. Short,
Plaintiffs-Appellants,

Jerry Fitzpatrick, Intervenor-Appellant,

v.

S/S **PEIK**, its engines, etc., Defendant-
Appellee.

No. 28325

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

July 7, 1970.

Joseph W. Nelkin, New Orleans, La., for Ajubita and Short.

Faris, Ellis, Gilmore Cutrone & Lautenschlaeger, New Orleans, La., for Fitzpatrick; L. J. Lautenschlaeger, Jr., New Orleans, La., of counsel.

Terriberry, Carroll, Yancey & Farrell, Walter Carroll, Jr., Benjamin W. Yancey, New Orleans, La., for appellee.

Before THORNBERRY, CLARK and INGRAHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

■ This is an appeal in admiralty by three pilots who rendered their services in the vicinity of the Port of New Orle-

ans, have not been paid by the now-bankrupt charterers of the vessel, and therefore assert a lien against the vessel itself. The owner of the vessel opposes them. The question whether they are entitled to the lien depends upon the construction given the Federal Maritime Lien Act, 46 U.S.C. §§ 971–975 (1958). We have determined that the Act applies to this case and that it does not allow the lien to attach. This is the decision reached by the trial court, and we therefore affirm.[1]

The vessel is owned by E. B. Aaby's Rederi A/S, a Norwegian shipper. She was at all times material to this action time chartered by Lacey & Company of New Orleans. Lacey ordered a pilot from the Crescent River Port Pilots Association in order to maneuver the vessel for loading, and the Association furnished Appellant A. W. Short. Short performed the services properly, and his statutory fee is $50.00. After the cargo was loaded, Lacey again ordered a pilot from the Association, which furnished Appellant Adolph Ajubita, to pilot the vessel from the Port of New Orleans to Pilottown on the way to sea. Ajubita performed these services properly and his statutory fee is $177.75. At Pilottown, according to custom, the Associated Branch Pilots furnished a new pilot, not arranged for in advance by any of the parties to take the vessel out to sea. Intervenor-appellant Jerry Fitzpatrick performed these services, and his statutory fee is $177.19. In all cases, the pilots were given receipts by the master of the ship, who was employed by the vessel's owners, E. B. Aaby's Rederi S/A. The contract of charter between E. B. Aaby's and Lacey, however, contained a lien preclusionary clause, providing that the charterers were to have no authority to incur any lien against the vessel. It is undisputed that none of the pilots, nor the respective pilots' associations through which they were hired made any inquiry at any time as to whether the charterer, Lacey, was empowered to create liens upon the boat for these services. They did not ask any questions of the ship's personnel.

The Congress of the United States enacted the Federal Maritime Lien Act in 1910 in order to create uniformity in the field of maritime liens. The operative part of the Act allows a lien to attach in favor of any person furnishing certain types of services or "other necessaries" to the operator of a vessel. However, the Act does not allow the lien to attach where the furnisher knows, or "by the exercise of reasonable diligence could have ascertained," that the operator is without authority to bind the vessel under a lien. The appellant pilots present two arguments as to why their lien should attach. First, they say that pilotage is not a "necessary" under the Act, and that consequently the Act does not apply so that they are eligible for a lien under state law. The law of Louisiana apparently furnishes such a lien. Secondly, the pilots say that under the circumstances they exercised reasonable diligence and therefore cannot be bound by the lien preclusionary clause. We take up the issues in this order.

First, we think the argument that pilotage is not a "necessary" within the meaning of the Act is without merit. Many times when it is used in the law, the word "necessary" does not refer to something that is absolutely indispensable. The "necessary and proper" clause of the Constitution, which gives powers to the Congress, has not been rigidly construed. In tax law, the term "necessary and ordinary business expense" has been held to include some expenditures that are not absolutely indispensable but are appropriate and helpful to carrying out business. So, too, the term "necessary" under the Maritime Lien Act has been held to include expenditures that are not absolutely indispensable. It includes most goods or services that are convenient or useful to the vessel, such as the services of an advertising agency for a cruise ship, printing supplies, or

---

1. Pursuant to our Local Rule 18 we decide this case on the briefs and record.

liquor for a pleasure yacht. *See* Stern, Hays & Lang, Inc. v. M/V Nili, 5th Cir. 1969, 407 F.2d 549; Colonial Press of Miami, Inc. v. The Allen's Cay, 5th Cir. 1960, 277 F.2d 450; Walker-Skageth Food Stores v. The Bavois, S.D.N.Y. 1942, 43 F.Supp. 109; *cf.* Payne v. S/S Tropic Breeze, 1st Cir. 1970, 423 F.2d 236. Pilotage services, especially when required by state law as they were here, certainly fall within this definition. The Federal Maritime Lien Act would be available to these pilots under proper circumstances, and since it is designed to create uniformity among the jurisdictions in which admiralty law applies, it preempts the field.[2]

■ Appellants' second argument is more difficult. They argue that they acted reasonably in not checking the terms of the charter party. It is true that the pilots are required by state law to furnish services upon request in the absence of "good cause" for refusing, with revocation of their commission as a possible sanction. However, we think lack of security protection where a ship operator has not established good credit would constitute good cause for refusing to offer services on other than a cash basis. Indeed, the record shows that the pilots association put Lacey & Company on a cash basis when it found out that Lacey would be difficult to collect from. The argument then turns to the burdensome task of discovering the terms of a charter agreement. Certainly pilots should not be required to exercise the degree of diligence that would be expected of a person contracting for a large amount of money, since their fees are all below $200.00. Given all the circumstances, appellants make out an appealing case to the effect that they acted as reasonable men would act.

Our question, however, is whether appellants' conduct allows them to escape being charged with knowledge of the charter party under the law. The fact is that inspection of the terms of the Act, and of the authorities that have interpreted it, puts to rest any argument that appellants may avoid the presumption when they have totally failed to inquire. Passive innocence is not enough. The statute requires that appellants exercise some degree of care. It requires that they show that they could not have learned of the terms of the charter by "reasonable diligence." As Mr. Justice Holmes stated in United States v. Carver, 1922, 260 U.S. 482, 489, 43 S.Ct. 181, 182, 67 L.Ed. 361, "We regard these words as too plain for argument. They do not allow the materialman to rest upon presumptions until he is put upon inquiry, they call upon him to inquire. To ascertain is to find out by investigation. If by investigation with reasonable diligence the material man could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms. In this case it would seem that there would have been no difficulty in finding out both." The duty to inquire is "plain and positive." Tampa Ship Repair & Dry Dock Co. v. Esso Export Corp., 5th Cir. 1956, 237 F.2d 506, 508. In this case, inquiry of the ship's personnel would probably have informed appellants of the controlling charter provisions, or inquiry of the charterer's representatives by the pilots' associations, both of which maintained administrative offices in the city. This inquiry would not be so burdensome as to remove it from the description of "reasonable diligence" even under the circumstances. *Cf.* Tampa Ship Repair & Dry Dock Co. v. Esso Export Corp., *supra*; Lindbar, Inc. v. St. Louis Fuel & Supply Co., 6th Cir. 1960, 276 F.2d 882; The Kongo, 6th Cir. 1946, 155 F.2d 492.

One other argument has been raised by appellants to show that they exercised reasonable diligence. They point out that the master of the ship was in the employ of the owner and that he signed receipts for the services. The

---

2. Superseding of state laws is provided for by 46 U.S.C. § 975 (1958).

**1348**

trouble with this argument is that the master of a time-chartered vessel is a hybrid creature. He does not have authority to bind the owner as to pilotage when the terms of the charter party provide otherwise; he is the agent of the charterer. In a strikingly similar situation, the Supreme Court has stated that "The mere fact that the owner has furnished the master and crew cannot be regarded as decisive of the question before us." Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 1940, 310 U.S. 268, 278, 60 S.Ct. 937, 942, 84 L.Ed. 1197; see also First Nat'l Bank & Trust Co. of Vicksburg, Miss. v. The Seneca, E.D.La.1960, 179 F.Supp. 847, 850. Appellants' reliance upon this argument, and upon 46 U.S.C. § 972 (1958), must fall in light of the specific duty to inquire imposed by the Act.

Affirmed.