VIRGINIA SHIPBUILDING CORPORATION v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION et al.

UNITED STATES v. VIRGINIA SHIP-BUILDING CORPORATION et al.

(District Court, E. D. Virginia. March 5, 1925.)

Nos. 7, 115A.

1. Maritime liens ⬳65—Person intrusted with ship presumed to have authority to contract liens, unless furnisher could have ascertained limitation on authority.

Under Merchant Marine Act June 5, 1920, § 30, subsecs. p–t (Comp. St. Ann. Supp. 1923, §§ 8146¼ooo–8146¼q), law presumes that one intrusted with ship has authority to procure supplies on credit of ship, unless owner has withheld authority, and furnisher knows, or by diligence could have ascertained, it, and burden of proving contrary is on owner.

2. Maritime liens ⬳30—Persons dealing with vessel chartered, or in possession of agreed purchaser, must exercise reasonable diligence.

Persons doing business with vessel under charter, or with agreed purchaser in possession, must exercise reasonable diligence to ascertain limitation on right of operators of vessel to procure necessary repairs and supplies, and on failure to do so no lien exists.

3. Maritime liens ⬳29—Furnishers of services and supplies held entitled to lien.

Under Merchant Marine Act June 5, 1920, § 30, subsecs. p–t (Comp. St. Ann. Supp. 1923, §§ 8146¼ooo–8146¼q), furnishers of services and supplies to vessels in possession of operating company through persons lawfully claiming right to their control and management, and not as charterer or agreed purchasers, were entitled to maritime liens, notwithstanding limitations on authority to pledge vessels under contract of sale by Shipping Board Emergency Fleet Corporation, which were unknown to furnishers, and which they could not have discovered by inquiry.

4. Maritime liens ⬳30—Furnishers of supplies and materials not bound to investigate complicated facts.

Duty of furnishers of services or supplies to ships to exercise reasonable diligence to ascertain limitation of authority of those in possession implies that inquiry would discover such limitation, and does not require investigation into complicated facts, requiring judicial interpretation, and to decide at their peril whether lien is possible.

5. Maritime liens ⬳4—Government vessel held liable for maritime liens incurred in operation of vessels in which government was directly interested.

Where government was directly interested in operation of vessels under contract for sale, in that it was entitled to receive net revenue in payment for other vessels, held that vessel was liable for maritime liens incurred in operation.

6. Maritime liens ⬳61—Defense of laches held not available to owner of vessel.

Where government, and one to whom it sold vessels, had been engaged in continuous efforts to adjust matters between themselves, held that defense of laches was not available against maritime lien claimants.

In Equity. Suits by the Virginia Shipbuilding Corporation against the United States Shipping Board Emergency Fleet Corporation and another, and by the United States against the Virginia Shipbuilding Corporation and others, wherein Loveland & Co. and others asserted maritime lien claims. Decree for lien claimants.

Chauncey G. Parker and F. R. Conway, both of Washington, D. C., and Paul W. Kear, U. S. Atty., of Norfolk, Va., for U. S. Shipping Board Emergency Fleet Corporation and the United States.

Eugene B. Van Veen, of Washington, D. C., for Robbins Dry Dock & Repair Co.

Lewis, Adler & Laws, of Philadelphia, Pa., for S. G. Loveland & Co.

Lucien H. Van Doren, of Washington, D. C., for Rees J. Evans.

Baird, White & Lanning, of Norfolk, Va., for Bernard B. Smith, Assignee, Colgan Mfg. & Supply Co., Asiatic Petroleum Co., and Crandall Packing Co.

WADDILL, Circuit Judge. These cases are now before the court upon consideration of the claims of persons asserting maritime liens. They arose in this way: In the two above equity causes, the first named was for an accounting brought by the Virginia Shipbuilding Corporation against the United States Shipping Board Emergency Fleet Corporation, and the second by the United States against the Virginia Shipbuilding

Corporation and others to foreclose certain mortgages upon ships subsequently sold herein. The subject of the litigation was 10 certain ships built by the Virginia Shipbuilding Corporation for the government, pursuant to contract. Pending completion of the contracts, the ships were taken over by the Virginia Shipbuilding Corporation at an agreed price, pursuant to a certain adjustment contract dated September 25, 1919, and a supplemental agreement thereto of July 19, 1920, to which latter was attached an agency agreement for managing and operating steel cargo vessels, known as form M. O. 3. Thereafter, by further agreement between the parties, the ships, as completed, were delivered to the United States Transport Company, an operating company, with a view of placing them in commerce, the object being to make earnings to pay their indebtedness under said contracts. The contracts of September 25, 1919, and July 19, 1920, contemplated, after the completion and delivery of the vessels, that there should be a bill of sale executed for each vessel, and a mortgage given for the amount due on the vessel as of the date of delivery. As to only 2 of them, the H. F. Morse and the Vanada, were the bills of sale and mortgages actually taken, though 7 of the others were delivered, and all 9 placed in operation pending the consummation of the formal execution of the papers. One of the ships was neither completed nor delivered.

The maritime claims in question were for bills incurred pending the operation of the ships, and the rights of the claimants in large measure depend on the circumstances under which the same were contracted: (a) Whether the operating company acted in behalf of the Emergency Fleet Corporation; (b) if not, whether there was such a reservation of title to and lien upon the ships in behalf of the government as would impose upon persons in the position of the claimants the duty of inquiring to ascertain the ownership and exact status of the several vessels; (c) whether, in the circumstances here, had the claimants exercised reasonable diligence, they would have been able to ascertain the existence of conditions that would have estopped them from lawfully doing business with the ships; (d) whether the government should equitably and fairly assert its claim to the proceeds of the sale of the vessels sold and purchased by it in these proceedings, as superior to those of the maritime claims.

The maritime claims amount in the aggregate approximately to $90,445, and the claimants, who were either brought into the proceedings by rule or voluntarily by consent appeared and filed their petitions, are eight in number, representing 15 separate claims, as follows:

| Claimants. | Amount. | Vessels Furnished. |
| --- | --- | --- |
| Loveland & Co. | $ 3,362.85 | Clement C. Morse |
| Rees J. Evans, Asiatic Petroleum Co. | 4,362.79 | Annie C. Morse |
| Same, | 19,175.31 | E. A. Morse |
| Same, | 36,000.00 | Vanada |
| B. B. Smith, Crandall Packing Co. | 951.89 | H. F. Morse |
| Same, | 515.65 | Jennie R. Morse |
| Same, | 150.99 | E. A. Morse |
| Same, | 1,077.14 | Clement C. Morse |
| Same, | 173.29 | Annie C. Morse |
| Same, | 298.35 | H. F. Morse |
| Same, | 725.65 | Colin H. Livingston |
| Colgan Manufacturing & Supply Co. | 703.35 | Clement C. Morse |
| Same, | 605.63 | Annie E. Morse |
| Howard, trustee Groton Iron Works | 13,667.11 | E. A. Morse |
| Robbins Dry Dock & Repair Co. | 8,675.00 | Clement C. Morse  Gunston Hall |

$90,445.00

The court will not attempt to go into detail in passing upon these several claims, but, on the contrary, consider them in bulk, as the essential features entitling them to recovery apply practically to all the claims alike. As to the requisites entitling claimants to assert their claims from a just and meritorious standpoint, there is no dispute; that is, that the services charged for were performed and supplies furnished either on the proper order of the transport company, the operator, or the lawful representatives of the several ships, and were of the value charged.

The ships were documented in the name of the United States in the proper home ports of the vessels, and there is no dispute that payment of the claims mentioned has not been made, and that the amounts thereof are due and long in arrears, and the sole question is whether or not liens attached upon the vessels to which supplies were furnished or for which labor was performed. On behalf of the claimants, it is insisted that a lien exists, and the Shipping Board or the government contends to the contrary.

First. It is a concessum in the case, practically, that, if the United States Transport Company was operating the ships on behalf of the Emergency Fleet Corporation, when supplies were furnished, then that the lien mentioned exists. Claimants insist that

they were so ordered, and the Fleet Corporation says to the contrary.

There is much in the record to warrant the contention made in behalf of the claimants that the ships were really being operated on account of the Shipping Board under the M. O. 3 agency agreement for managing and operating steel cargo vessels attached to the agreement of July 19, 1920, which, if correct, is conclusive of this controversy. Claimants insist that the testimony shows that, if inquiry had been made at the office of the transport company, inquirers would have been told that the steamers were operated under the M. O. 3 agreement. Petitioners Colgan Manufacturing & Supply Co., S. W. Coston & Co., Inc., and the Crandall Packing Company (the latter holding six of the above-named claims), made inquiry of Mr. White, the vice president of the United States Transport Company, and was told that the vessels were being operated under the M. O. 3 agreement. They further insist that, if inquiry had been made of Mr. Meekins, the regional director of the Shipping Board for the Atlantic Coast, inquirers would have been advised by him that the steamers were being so operated; and that as late as February or March, 1921, if inquiry had been made of Mr. Nottingham, Assistant Counsel for the Shipping Board, having especially to do with these matters, he would so have advised them, as shown by his letter to the American Surety Company, filed in the record, and his verification of the government's answer filed in these proceedings.

As above stated, it is conceded that, if the ships were so operated by the United States Transport Company for the benefit of the government, the claimants' rights to liens are conclusive. While the court thinks the evidence is strong to sustain this contention, it does not seem necessary under its view to pass upon the apparently disputed questions of fact or to rest its conclusions upon the same, as there are other grounds that should control in determining the rights of the parties in the circumstances, going more to the justice and equity of the claims, and avoid any suggestion that mere technical considerations may have entered into its findings.

The Circuit Court of Appeals for the Third Circuit, in the case of the Anna E. Morse, 286 F. 794, had the question of supplies furnished to one of these very vessels, and under the contracts here under consideration before it, and that court in an able and comprehensive opinion, upheld the right of claimants to assert maritime liens in substantially the same circumstances as here.

To this decision and the authorities cited special reference is made as being strongly persuasive, if not conclusive of the present controversy.

[1, 2] Second. Notwithstanding the fact that the vessels at the time when the work was performed and supplies furnished may or may not have been operated by the United States Transport Company in behalf of the Emergency Fleet Corporation, still it seems to the court that the claimants above named are entitled to maritime liens for the claims severally asserted by them. Their right of lien is based upon the Act of June 23, 1910, 36 Stat. 604 (Comp. Stat. §§ 7783–7787), as re-enacted in the Merchant Marine Act of June 5, 1920, 41 Stat. 988, § 30, subsecs. p, q, r, s, and t (Comp. St. Ann. Supp. 1923, §§ 8146¼ooo–8146¼q). As before stated, the maritime services were rendered and material and supplies furnished as charged for, and there is no dispute as to the justice of the claims, or that under the statute a lien exists therefor, unless the right thereto is barred by some of excepting provisions thereof. The law presumes authority on the part of one intrusted with a ship to procure necessary supplies and repairs incident to its operation, on the faith and credit of the ship, unless the shipowner has withheld or limited such authority; and, unless those who had furnished supplies or performed the services knew of such limitation of authority, or by reasonable diligence could have ascertained the same, and, if challenged, the burden of proof rests upon the owner of the vessel to refute such presumption of authority in favor of those furnishing supplies to the vessel. The South Coast, 251 U. S. 519, 523, 40 S. Ct. 233, 64 L. Ed. 386; The City of Milford (D. C.) 199 F. 956; The Yankee (C. C. A. 3d Cir.) 233 F. 919; The Oceana (C. C. A. 2d Cir.) 244 F. 80, 83, 156 C. C. A. 508; The Penn, Lord Baltimore (C. C. A. 3d Cir.) 273 F. 990. The authorities are clear that those doing business with a vessel under charter, or with an agreed purchaser in possession, must exercise reasonable diligence to ascertain, with the burden of proof as aforesaid, whether there exists a limitation upon the right and authority of those operating the vessel to procure necessary repairs and supplies, and upon their failure to do so no lien exists. Deibert Barge-Bldg. Co. v. United States (C. C. A.) 289 F. 805; Standard Oil Co. v. United States (C. C. A.) 1 F.(2d) 961; Frey & Son v. United States (C. C. A.) 1 F. (2d) 963, and Gill & Sons v. United States (C. C. A.) 1 F.(2d) 964. The rights neither

of charterers nor agreed purchasers in possession are involved in this case.

[3] But these conditions do not apply here, where the vessels had been placed in charge of the United States Transport Company, as an operating company, without any express and specific limitation upon its authority to do things ordinarily done by a vessel in its legitimate operations. Nothing was done by the government to safeguard and protect its rights and interest in the premises, nor to advise and inform those innocently and in good faith doing business with operators and managers of vessels owned by it against risk in so doing. The ships were documented in the government's name. No record in the appropriate custom house was made of any lien of the government against the vessels. The papers and documents purporting to state the government's claims were not carried upon the ship, nor was the vessel stamped with metal plates bearing the words "United States Shipping Board, Mortgagee," in one or more conspicuous places upon the vessels, as provided for in the form of purchase agreement, showing the government's interest.

The government's contention is that it transferred the vessels to the Virginia Shipbuilding Corporation, which transferred them to its subsidiary, C. W. Morse & Co., and that the latter company transferred them to the United States Transport Company, a subsidiary of C. W. Morse & Co. for operation, and the latter was acting, not in behalf of the Fleet Corporation, but the Virginia Shipbuilding Corporation, and that maritime lien claimants having to do with the ships were required to trace back title to the vessels through the several sources incident to their transfer and operation aforesaid.

This, in the court's judgment, they were not required to do, as it would have placed upon them an unreasonable burden, having regard to the operation of ships in the matter of expedition, and securing credit therefor. The United States Transport Company was not a charterer, nor an agreed purchaser in possession of the vessels. On the contrary, it was a mere operating company in possession through persons lawfully claiming the right to their control and management, and without knowledge on the part of supply and material men of any limitation of their right and authority in the premises; and such supply and material men were not bound, and should not be affected because of uncertainty as to their claims and interest in the ships, and especially without specification or limitation of their powers from them or from any other source.

The case of The Buckhannon, 299 F. 519, 522, a decision of the Circuit Court of Appeals for the Second Circuit, will be found of especial interest as bearing upon the meaning of the purchase agreement herein, the contract there being the same as the adjustment agreement here of September 25, 1919, or one in almost its identical language; and the court in that case expressly declined to accept the views contended for in this case as to the effect of the agreement on maritime lienors, and held that liens in their behalf existed irrespective of the limitations in the contract, and took pains (page 522) to note that ordinary cases affecting charter parties and purchasers in possession under contracts of sale or purchase agreements were not applicable, and should not control in construing the complex provisions of the contract then under consideration.

[4] The obligations imposed upon those rendering services and furnishing supplies to ships to exercise reasonable diligence to ascertain the limitation of authority, if any, of those in possession of the same, implies that had inquiry been made, information would have been afforded of such limitation, and it does not contemplate, although there may be some circumstances that might put them on inquiry, that they should be obliged "to conduct an investigation into facts often complicated, sometimes requiring judicial determination for their final interpretation, and to decide at his peril whether a lien was possible or not." The Neponset (D. C.) 300 F. 981, 986, 1924 A. M. C. 726, 733; The Bourbonnais (D. C.) 295 F. 869, 1924 A. M. C. 299, 302; The South Coast, supra, 251 U. S. 519, 521, 40 S. Ct. 233, 64 L. Ed. 386.

In the Anna E. Morse, supra, 286 F. 794, 796, the Circuit Court of Appeals for the Third Circuit, having under consideration the furnishing of supplies under the very contracts in question here, refers to the uncertainties in the meaning of the contracts as follows:

"In defense, the United States introduced a number of contracts of confusing details covering the building of the ships by the Virginia Shipbuilding Corporation, the financing of their construction, by the United States Shipping Board Emergency Fleet Corporation, the adjustment of disputes, conveyance of title of the ships to the United States of America, delivery thereafter to the United States Transport Company for operation pending a proposed sale to the Shipbuilding Corporation."

The court, at page 798, further makes reference to the effect of this contract as bearing upon the right of maritime lienholders, as follows:

"In searching this contract for lack of authority on the part of the transport company to procure supplies on the credit of ships assigned to it, the libelants would have found no provision whereby the United States, as owner, had withheld authority from the transport company to procure supplies for the ships it had entrusted to its management. Therefore, at this stage the transport company remained vested with authority presumed by the law to order supplies upon the credit of the ships, * * * and the libelants had a right to furnish the supplies upon the credit of the ships—if the ships for which the supplies were furnished were actually of the number assigned, or to be assigned, under the contract."

In further consideration of these contracts, the court, at page 801, referred to them as follows:

"In other words, these transactions, disentangled from details, would have disclosed to the libelant several things, * * * and, fourth, that there is no provision in any of the completed transactions withholding from the transport company authority to purchase supplies upon the credit of the ships. Hence there was nothing open to discovery by the libelants on inquiry which showed that the transport company, the person ordering the * * * supplies, * * * was without authority to bind the (vessels) therefor."

As respects the rights of claimants to maintain maritime liens in these causes, it seems entirely clear to the court that, taking into account the circumstances of the operation of the ships by the United States Transport Company regardless of whom it may have acted for, and the absence of limitation upon its authority so to do, claimants are entitled to the liens asserted, and that the provisions of the contract of September 25, 1919, between the Virginia Shipbuilding Corporation and the United States Shipping Board Emergency Fleet Corporation and the United States Shipping Board, representing the United States of America, and that of the contract of July 19, 1920, between the same parties are not so related to and connected with the agreement under which the ships were being operated by the United States Transport Company as to affect those doing business with the ships, or to defeat their liens for material and services rendered. On the contrary, had claimants been directly advised as to the two contracts in question, they would have been unable to secure any intelligent information as to their legal status, and become involved in a labyrinth of uncertainties which it has not been possible, on the part of the parties to said agreements, to settle to the present day, and, as among themselves, has but resulted in long, continuous, and unended bitter litigation.

[5] Another view of this subject which relates directly to the equity and justice of the position of the several parties is this: Whether the ships were being operated on behalf of the United States Shipping Board Emergency Fleet Corporation or the Virginia Shipbuilding Corporation, it is not disputed that the government was directly interested in the undertaking, in that the object and purpose was to make money with which to carry out the contracts, and particularly to complete the unfinished vessels Nos. 8, 9, and 10, and that the government was entitled to the net profits arising therefrom, pains being taken to ascertain such net balance which was to be disbursed by the United States Shipping Board Emergency Fleet Corporation. In the contract of July 19, 1920, in which provision was made for the operation of the ships, it is provided, among other things:

" * * * It is expressly agreed that the company may use the net operating revenues derived from the operation of hulls 1 to 7 and the hulls hereafter delivered for the purpose of financing the construction of hulls 8 to 10, inclusive, now under construction at the company's yard at Alexandria, Va. Such funds shall be disbursed by the treasurer of the Fleet Corporation through controlled account as at present."

In this view, it would be manifestly inequitable to allow the government to take the ships, and not pay the maritime liens incurred in an operation in which it was directly interested, and from which large profits were anticipated.

[6] The government suggests laches on the part of the claimants asserting their claims. Ordinarily there would be much force in this position as to some of them; but the defense has no proper application here where the parties were engaged in a continuous effort to adjust matters between themselves until the claimants were finally brought into these causes, with a view of lawfully determining their rights.

A decree may be entered in acordance with the views herein set forth, in favor of the respective claimants for the amounts of their claims, to be paid out of the funds to the credit of the court in these causes, arising

from the sale of the vessels, with interest from the dates of filing the respective petitions.