**RING v. THE DIMITRIOS CHANDRIS et al.**

No. 8003.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 2, 1942.

Decided Jan. 13, 1943.

Leslie C. Krusen, of Philadelphia, Pa. (Krusen, Evans & Shaw and Walter M. Phillips, all of Philadelphia, Pa., on the brief), for appellant.

Joseph W. Henderson, of Philadelphia, Pa. (Rawle & Henderson, Harrison G. Kildare, and George M. Brodhead, Jr., all of Philadelphia, Pa., on the brief), for appellees.

Before BIGGS, MARIS, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

This is a proceeding in rem to recover for services rendered to the steamship "Dimitrios Chandris." The latter is a vessel of Greek registry and arrived at Philadelphia on October 7, 1940. Upon her arrival, the immigration authorities ordered her crew of 34 alien seamen to be detained on board ship.[1] The law of the United States imposes a penalty of $1000 against a vessel and her master and agents for each detained seaman who escapes.[2] To prevent such liability, the agents for the ship arranged for the services of libellant who conducts a "Guard Service." She sent watchmen to the ship from October 8, 1940, to October 22, 1940, and now seeks to recover for that service.

The defense to this claim which also serves as the basis for a cross-libel is a purported breach of contract by libellant consisting of a failure of the watchmen to perform their task in a careful manner. This resulted in the escape of two detained seamen thus subjecting the vessel to a fine of $2000 which has been paid. This is the amount of the damages claimed in the cross-libel.

The trial court sustained the claims of both parties and gave judgment to respondent and cross-libellant for the difference. Libellant has appealed. No question is before us as to the libellant's claim for services nor its amount; the measure of the respondent's cross-claim is not in dispute if it is recoverable at all.

Libellant's theory of the case before this Court is that she did not undertake to guard the ship against the escape of the detained seamen but that she was merely to furnish guards who in the performance of their duties became the servants of the ship. Accordingly, if the watchmen were careless in the performance of their duties, she was not responsible.

We have examined the record in the case and do not find this defense directly raised either in the pleadings or during the trial of the case. At the trial counsel for libellant was asked by the court: "There isn't any doubt about the fact that she [libellant] was employed, and that the watchmen were placed on duty; it is a question of performance, isn't it?" He replied: "That is right." Libellant therefore could well be precluded from advancing this defense for the first time on appeal under the rules of this Court. See, Rule 25. However, even if examined on the merits the defense fails.

The issue it raises is whose servants were the watchmen at the time they were on guard duty on the ship? The answer depends on numerous factors. See, Restate-

---

[1] Executive Order No. 8429, 5 Fed.Reg. 2145 (1940).

[2] 43 Stat. 164 (1925); 8 U.S.C.A. § 167(a).

ment, Agency (1933) §§ 220, 227. All of the determinative facts are not clearly defined by the evidence. There was evidently no written contract or memorandum of agreement, the libellant's employment having been arranged orally by the local agents for the ship in Philadelphia. However, a compilation of available data, establishes, we think, that the watchmen were at the time in question libellant's servants. Although the ship's master specified the number of guards he needed, the guards were selected by libellant. When a smaller number were necessary she determined which guards went off duty. Undoubtedly, she could substitute men. The time of their employment on the ship was short and temporary. She determined the working hours and shifts. Payment was not made to the watchmen, individually, but to libellant. Weapons were not supplied by the ship, and such of the men as were armed, brought guns with them. Although there was no full-time supervisor present, the libellant did send a "roundsman" who acted in a supervisory capacity in checking the watchmen. He also was the one who, after having received instructions from the ship's officers as to the nature of the task and recommendations as to how it was to be done, gave directions and orders to the men. Finally, the statement sent to respondent by libellant for the services rendered states that it is for "guarding detainees on board ship."

Libellant presses facts which point the other way. The captain of the ship specified the number of watchmen needed. This might be a defense if it were claimed that the escape resulted because the watch were undermanned. Such, however, was neither argued nor arguable, since on the night of the escape, five guards had to watch six men, the detention order having been amended so as to apply only to that number. The captain, it is said, told the men of their duties and gave them their instructions. The evidence is contradictory on this point. Be that as it may, we think the evidence shows that the one who ultimately controlled and had the right to control the men in the performance of their duties was the libellant. It is true that some of the facts support libellant's contention. However, this is invariably the case where the issue of whose servant a man is arises. The group of factors which preponderates is determinative of the answer. Here, the scales tip towards the libellant. We conclude, with the District Court, that the libellant Ring, was the employer of the watchmen.

█ There remains the question whether the evidence supports the conclusion that the libellant broke her contract which called for the exercise of reasonable care on her part because the guards were negligent in the performance of their duties. On the night of the escape, there were five watchmen on duty during the 12M–8A.M. shift. Three were stationed on board the ship; two were on the dock along which the ship was berthed. Both the ship and dock were sufficiently lighted for a watchman to see his way around. Two of the men detained on board ship that night were Spaniards, and were, according to testimony which we think credible, in their bunks at 2:30 A.M. They were not on board ship at seven the following morning. No one had seen them leave the ship; nor is there any evidence showing how they got ashore. The officers of the ship had furnished the watchmen with a list of the men to be detained and their instructions were not to allow anyone to leave the ship unless he displayed the proper passes. There is no question of the two Spaniards having used passes of other seamen for it is undisputed that all who had left the ship by passes that night returned and were accounted for. On this evidence, the court below concluded there was a lack of necessary and proper care which constituted a breach of performance under the contract since the watchmen did not see the detained seamen leave or having seen them made no effort to detain them.

We agree with this conclusion. It is admitted in the pleadings that the missing men escaped; consequently the suggestion in the argument on appeal that they might have been chopped up and stuffed in the boiler comes too late. This does not seem to us to be a case which involved any problem of piling inference on inference. Nor does the situation seem one where the conclusion can be strengthened by reference to decisions in other cases. Two men are in their bunks at 2:30 in the morning; they are gone at 7 A.M. Their bunks are in the forecastle from which there is only one means of egress. Five men are on guard stationed where they can see everything which goes on and the lighting is sufficient to allow them to see. On this set of facts we think the conclusion is

correct. The missing men got away either through carelessness on the part of the watchmen or with their acquiescence.

The decree of the District Court is affirmed.