179 F.Supp. 847 (1960)
FIRST NATIONAL BANK AND TRUST COMPANY OF VICKSBURG, MISSISSIPPI, Libellant
v.
THE Towboat SENECA, and L. R. Flowers and J. W. Jordan, Jr., as Owners, Respondents,
St. Louis Shipbuilding & Steel Company, Intervenors.
No. 3436.
United States District Court E. D. Louisiana, New Orleans Division.
January 11, 1960.
*848 Brunini, Everett, Grantham & Quin, Vicksburg, Miss., Chaffe, McCall, Phillips, Burke & Hopkins, Leon Sarpy, New Orleans, La., proctors for libellant.
Phelps, Dunbar, Marks, Claverie & Sims, George W. Healy, III, New Orleans, La., proctors for intervenors.
J. SKELLY WRIGHT, District Judge.
This case involves the troubled question of attachment of maritime liens. The libellant bank, having had the vessel sold pursuant to its libel to foreclose its preferred maritime mortgage, is faced with a claim against the proceeds by the shipyard intervenor for services rendered the vessel prior to the recordation of the mortgage.[1] The precise question presented is whether the rendering of these services created a maritime lien.
The M/V Seneca was acquired by the Vicksburg Towing Company, Inc. from Canal Barge Company, Inc. under bill of sale dated March 5, 1955, duly registered with the United States Collector of Customs in Baton Rouge. On March 31, 1955, a preferred maritime mortgage under the Ship Mortgage Act of 1920[2] was granted by Vicksburg Towing Company in favor of Merchants National Bank and Trust Company of Vicksburg, Mississippi, which mortgage was also duly recorded with the United States Collector of Customs in Baton Rouge, a copy thereof being carried on board the vessel among her documents until its payment and cancellation on October 26, 1956, on which date it was succeeded by the mortgage in suit in favor of the libellant bank.
On acquisition of the Seneca, Vicksburg Towing Company bareboat chartered the vessel to DeSoto Transportation Company, also a Mississippi corporation, by written charter party dated October 15, 1955. In addition to providing for the monthly hire of the vessel, the charter incorporated an option to purchase agreement under which the charter hire would be applied against the purchase price. The charter also prohibited imposition of liens on the vessel except by order of the owner.[3] A copy of this charter was also carried aboard the vessel with the other ship's papers.
DeSoto Transportation Company operated the vessel pursuant to the charter beginning October 22, 1955. On September 21, 1956, DeSoto notified[4] Vicksburg that it wished to exercise the purchase option and would be glad to discuss financial arrangements. DeSoto's sole stockholders, respondents herein Jordan and Flowers, then arranged with the libellant bank for a loan of $38,500.00 with a preferred maritime mortgage on the Seneca as security. This mortgage was executed on October 26, 1956, contemporaneously with the cancellation of the mortgage in favor of the Merchants National Bank and the delivery of the warranty deed from Vicksburg to Flowers and Jordan, who purchased the Seneca in their own names. Subsequently, on November 2, 1956, the maritime mortgage to libellant bank was duly registered with the United States Collector of Customs in Baton Rouge. There is no attack on the validity of this mortgage or the good faith of the bank in executing it on Vicksburg's no lien warranty and the title investigation by the bank's attorney
*849 Meanwhile, on September 23rd, two days after the exercise of the option, Flowers, acting as captain of the vessel and representing himself to be the owner thereof, contracted with the shipyard intervenor for certain work on the Seneca. This work was performed between the dates September 23 and September 27, 1956. In addition, on September 27, 1956, Flowers ordered two propellers installed on the Seneca. Because these propellers had to be fabricated, the actual work of installation was delayed until January 25, 1957 and completed on February 15, 1957.
Flowers was well known to the shipyard. He had brought the Seneca there on many occasions for repairs while she was under charter to DeSoto. DeSoto was billed for these repairs and the bills were paid. The evidence does not disclose whether the shipyard was aware that Flowers represented the charterer and not the owner of the Seneca. On the occasion in question, however, when the repairs in suit were ordered, in spite of the fact that Flowers then represented himself to officials of the shipyard as the owner of the vessel, no request was made to see the vessel's papers. If such inquiry had been made, admittedly, those papers would have been produced, including the charter. There is no suggestion that Flowers intended to deceive the shipyard. Flowers, a man of little business experience, sincerely believed that, because he and his partner had exercised the option to purchase, they owned the vessel.
The shipyard claims it was justified in relying upon the word of Flowers. Realizing, however, that such reliance in itself can hardly be held to constitute the reasonable diligence required by the statute,[5] it quickly takes the alternative position that further inquiry would have disclosed that the charter prohibiting the imposition of liens by the charterer had been terminated by the exercise of the option to purchase on September 21, 1956. In any event, it contends that this further inquiry into the legal position of Flowers, vis-a-vis the owner of the vessel, would have so confused the shipyard officials that they would be justified in relying on Flowers' representation, the suggestion being that a shipyard is not required to solve involved legal problems at the risk of having its lien disallowed.[6]
The parties are in agreement that Mississippi law applies to the nonmaritime contract to purchase the vessel included in the charter. There the agreement ends. The Mississippi law, however, on this subject is not different from the law generally.[7] When an option is exercised, the option agreement is converted into a mutually binding and enforceable agreement to sell. Where, as here, the parties contemplate the execution of an act of sale or deed to the property, title does not pass on the exercise of the option. This is particularly true where arrangements respecting the purchase money are yet to be made. The exercise of the option by respondents, therefore, while changing the relations of the parties with respect to the option part of the contract, had no effect whatever on its charter provisions. One of these charter provisions prohibited the liening of the vessel by the charterer. This charter was aboard the vessel at the time the work order in suit was issued. It would have been produced on request, but no request was made. Consequently, no maritime lien attached.[8]
*850 It is true that Flowers was the master of the Seneca and that ordinarily a shipyard may rely on that officer's presumed authority to lien the vessel.[9] But such presumption does not relieve the shipyard of its statutory duty to use reasonable diligence to determine whether or not such authority does in fact exist.[10] Where it is shown that the shipyard, by reasonable diligence, could have ascertained the truth, the presumption of authority in the master of the vessel disappears. Here, admittedly, a simple request to see the ship's papers, after Flowers' representation that he was acting for her owner, would have disclosed the true facts. It would have disclosed (a) that Flowers was neither the owner nor its representative, (b) that the charterer was prohibited from liening the vessel, and (c) that a maritime mortgage to the Merchants Bank existed, which mortgage, incidentally, was retired with the money raised through the mortgage in suit.
Further inquiry would also have disclosed that DeSoto had exercised its option to purchase the vessel. But such disclosure would not justify the shipyard in accepting Flowers' interpretation of the legal effect of that exercise. True such disclosure would have advised the shipyard that DeSoto was "an agreed purchaser in possession of the vessel." However, as the statute specifically provides,[11] the duty of the shipyard to use reasonable diligence to determine whether such "agreed purchaser" has authority to bind the vessel still persists. Actually, as the record demonstrates, shipyard intervenor was not concerned with binding the vessel. Flowers, as master of the Seneca, had had a course of dealings with intervenor for many months. The shipyard's bills were always addressed to and paid by the charterer. The disclosure that the charterer might now be the owner of the vessel would have been of little interest to intervenor, at least insofar as payment of its bills was concerned, particularly in view of the then outstanding maritime mortgage.
The history of the Ship Mortgage Act[12] shows that Congress was interested in encouraging the investment of capital in the American Merchant Marine. Before the passage of the Act, because a mortgage on a vessel was not a maritime contract,[13] such mortgage was primed by all maritime liens, whenever attached. Under the Act, the maritime ship mortgage, with certain exceptions,[14] protects the investor against all maritime liens subsequently attached. The Act goes further, however. It protects the maritime ship mortgage against prior obligations resulting from repairs or supplies to the vessel unless those repairs or supplies were authorized by her owner. The Act provides the means by which an owner may charter his vessel and prohibit the attachment of liens by the charterer.[15] In this way an investor requiring a ship mortgage may accept with assurance the owner's certificate that no prior maritime liens have attached, at least during the pendency of the charter. Consequently, if an investor is to be given the protection intended by Congress, he should be allowed to proceed with confidence on the recorded ship's documents. He should not be required to guess who the equitable owner of the vessel may be. He should be able to rely, as to ownership at least, on the title which is recorded with the Collector of Customs as required by law.[16]
Here, the bank did just that. It had the title to the Seneca examined in the proper offices. It received the certificate of her recorded owner that no prior *851 maritime liens existed. It studied the charter party prohibiting the charterer from liening the vessel. Under the circumstances, its investment should be protected against putative owners of the vessel who, having had the vessel repaired prior to the execution of the warranty deed and ship mortgage, failed to disclose to the title owner and the bank that the bill for such repairs remained unpaid, or even that it had ever been incurred. It is true that the shipyard here may also have been victimized by these putative owners. But if the shipyard had used the reasonable diligence required by the Act, it would have learned, in advance of the repairs, that the vessel would not be bound therefor.
Decree accordingly.
NOTES
[1] 46 U.S.C.A. § 953.
[2] 46 U.S.C.A. § 911 et seq.
[3] The charter, in pertinent part, reads:

"Article VII. Charterer Has No Authority To Impose Liens On The Towboat. Neither Charterer nor any of its officers, agents or employees, or the Master or any other officer or member of the crew of the Towboat, shall have any right, power or authority to create, incur, suffer or permit to be placed or imposed upon the Towboat any maritime or other lien, encumbrance or charge whatsoever, or to incur debt, obligation or charge upon the credit of the Towboat * * *"
See 46 U.S.C.A. § 973.
[4] On September 21, 1956, DeSoto wrote Vicksburg as follows:

"Please be advised that we wish to exercise purchase option as set forth in Article 19 of the above mentioned agreement. We will be glad to discuss financial arrangements with you at your convenience."
[5] 46 U.S.C.A. § 973.
[6] Citing Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197; Virginia Shipbuilding Corporation v. United States Shipping Board E. F. Corp., D.C., 11 F.2d 156.
[7] Cole v. Haynes, 216 Miss. 485, 62 So.2d 779, 33 A.L.R.2d 1378; Morris v. Smith, 184 Miss. 618, 185 So. 548; Reynolds v. Maples, 5 Cir., 214 F.2d 395; 55 Am. Jur., Vendor and Purchaser, §§ 27, 28, 29, 41, 43; 1 Corbin on Contracts § 264.
[8] Tampa Ship Repair & Dry Dock Co. v. Esso Export Corp., 5 Cir., 237 F.2d 506.
[9] 46 U.S.C.A. § 972.
[10] See Tampa Ship Repair & Dry Dock Co. v. Esso Export Corp., supra.
[11] 46 U.S.C.A. § 973.
[12] 46 U.S.C.A. § 911 et seq. See Gilmore & Black, The Law of Admiralty § 9-48.
[13] Bogart v. The John Jay, 17 How. 399, 58 U.S. 399, 15 L.Ed. 95.
[14] 46 U.S.C.A. § 953.
[15] 46 U.S.C.A. § 973.
[16] 46 U.S.C.A. § 921.