**J. F. McNAMARA CORPORATION, a corporation, Libelant,**

v.

**The MOTOR TANKER TABRIZ, her boilers, engines, boats, masts, anchors, tackle, furniture, apparel and equipment, Respondent.**

**Wilh. WILHELMSEN, Cross-Libelant,**

v.

**J. F. McNAMARA CORPORATION, a corporation, Cross-Respondent.**

**Civ. Nos. 5–60–96, 5–60–108.**

United States District Court
D. Minnesota,
Fifth Division.

Sept. 21, 1962.

Conrad M. Fredin, of Butchart, Fredin, & Eaton, Duluth, Minn., for libelant and cross-respondent.

John D. Jenswold, of Reavill, Jenswold, Neimeyer & Johnson, Duluth, Minn., for respondent and cross-libelant.

DONOVAN, District Judge.

The libel herein was brought by the J. F. McNamara Corporation, a Minnesota corporation, against The Motor Tanker Tabriz (hereinafter referred to as the Tabriz) to recover for services and materials furnished to the vessel.

A cross-libel was filed by Wilh. Wilhelmsen (hereinafter referred to as the owner) against J. F. McNamara Corporation (hereinafter referred to as libelant).

At the commencement of proceedings the libel action against the vessel was

consolidated with the cross-libel against the J. F. McNamara Corporation for trial as one cause and the case was tried to the court without a jury.

It is alleged that during the period June 14, 1960, through June 15, 1960, libelant, at the request of Alastair Guthrie, Incorporated, (hereinafter referred to as Guthrie) which was then and there the agent for the Tabriz, furnished and delivered to said vessel in the Port of Duluth, Minnesota, certain services and materials of the value of $4,725.70.

It is further alleged that the owner, agent and master of said vessel, though requested to pay said amount owed libelant, have failed to do so and that the whole of said amount is now due and payable.

Pursuant to the prayer of the libel, this court issued its monition against said vessel. Following the seizure and arrest thereof by the United States Marshal, a claim of ownership of said vessel and a stipulation for value to release the arrest thereof were filed in behalf of the owner, Wilh. Wilhelmsen of Oslo, Norway, by Guthrie, as said owner's agent.

The answer of Wilh. Wilhelmsen, as owner of the Tabriz, alleges that only the sum of $84.08 of the total amount of libelant's claim is for services furnished at the request of said Guthrie, which was then and there agent for the owner.

The cross-libel arises out of the subject matter of the aforementioned libel. It alleges for a first cause of action that the services furnished to the Tabriz by libelant were so negligently performed that as a direct result thereof, the owner lost the useful service and expense of maintenance of said vessel, all to his damage in the sum of $7,200.00. It is alleged for a second cause of action that the owner by his agent, Guthrie, employed libelant to furnish watchmen's services for the Tabriz and that as a result of the negligent performance thereof, the owner was damaged in the sum of $200.00. Libelant by its answer denies that it was negligent with respect to the aforementioned services furnished to the owner.

The facts giving rise to this litigation are as follows:

On May 12, 1960, the Osborne McMillan Elevator Company of Minneapolis, Minnesota, entered into a charter party agreement with the owner for the purpose of chartering the Tabriz to carry grain from the ports at Duluth, Minnesota, and Superior, Wisconsin, to ports in the north of Europe.

The Tabriz, which has 27 cargo tanks, was built in 1954 and prior to the above charter party had been engaged in what is known as "dirty trade." This refers to the fact that the vessel was used to transport crude and fuel oil. It became necessary, therefore, to convert the Tabriz from an oil tanker to a bulk grain carrier.

This work was commenced in the middle of May, 1960, while the Tabriz was laid up in Oslo, Norway. The Gamlen Company of Gamlen, Norway, was engaged by the owner to accomplish this conversion. Captain Thoralf Hovde of the Gamlen Company supervised the cleaning operation. A crew of 12 to 16 men was employed in the task of "butterworthing" the cargo tanks. This is a process in which a mixture of steam, hot water and certain chemicals is forced through a hose which is lowered into the tanks being cleaned. The process removes sediments and loose rust from the tanks following which men are sent down into the tanks to remove said deposits.

This work continued up to May 25, 1960, when the Tabriz left Oslo bound for the Port of Duluth. Captain Hovde remained aboard the Tabriz for the purpose of supervising the cleaning job which continued while the ship was en route to Duluth. The Tabriz arrived at the Port of Duluth on June 14, 1960. Captain Hovde testified that at this point most of the cargo tanks were ready to receive cargo. He expressed the opinion that with the help of those available from the ship's crew, the remaining

work could have been accomplished in 24 hours.

On the morning of June 14 the Tabriz was boarded by inspectors of United States Customs and Immigration and by Captain Miles of National Cargo Bureau, Inc. Captain Miles inspected the vessel and found oil slicks and deposits, rust scales and water in two of the cargo tanks. He declared that the vessel was not at that time ready to carry grain.[1]

John F. McNamara, who is president of libelant, was on board at the time as were Davis Helberg and Raymond Murdock representing Guthrie. Libelant had been hired under subcontract by Empire Stevedoring Company Ltd. of Montreal, Canada, for the purpose of "fitting" the cargo tanks for the shipment of grain. This involved principally the constructing of "roseboxes" which consist of lumber fitted over the bilge suctions in each of the cargo tanks.

McNamara testified that when he boarded the vessel the cargo tanks were not ready for the carriage of grain due to the fact that water remained in them in the form of sediment. He pointed this out to Captain Roeggen who was then master of the Tabriz. McNamara testified that at this time an agreement was entered into with Captain Roeggen whereby libelant would handle the cleaning of the tanks for cost plus 18% and would attempt to complete the work by 4 p. m. of the following day. There were no witnesses to this conversation between McNamara and Captain Roeggen.

There was testimony by Davis Helberg of the Guthrie firm and Captain Hovde that on this day McNamara made statements to them to the effect that libelant could do the cleaning job for a few hundred dollars and have the vessel ready that same night. McNamara did not recall these conversations, but testified that he definitely made no such representations to Captain Roeggen. Captain Roeggen was not called to testify.

Helberg testified that he informed his supervisor, James Gibson, concerning his conversation with McNamara. Gibson in turn relayed the information to Talabot Shipping and Trading Company Ltd. of Montreal, Canada (hereinafter referred to as Talabot). Talabot during the time in question was the owner's agent in Canada. McNamara ordered in his crew of 31 men and commenced cleaning the Tabriz at 1 p. m. on June 14. Six of the crew were put to work building and fitting roseboxes to be installed in the cargo tanks. Except for an hour break for lunch, McNamara's crew worked until 3 a. m. of the following day, June 15, at which time a break was taken. Work was resumed at 8 a. m. on June 15 and continued until 11:30 p. m. of that day with two lunch breaks of one hour each.

James Gibson of the Guthrie firm boarded the Tabriz on the afternoon of June 15 at which time he learned that the vessel would not be ready until midnight of that day. After conferring by phone with Talabot, Gibson told McNamara later that evening that libelant's services were no longer required and work was halted at 11:30 p. m. Following this, Gibson hired another firm, Twin Ports Cleaners, to complete the job. This firm worked from 7 a. m. June 16 to midafternoon of June 17, at which time the Tabriz passed the necessary inspections for the carrying of grain.

1. Libelant's exhibit 6 is a report made to Guthrie by one Eric Sonnichsen, also of the National Cargo Bureau, who inspected the tanks of the Tabriz for bulk grain carriage on the afternoon of June 14. The report notes the following conditions of the tanks:
  "1. All tanks heavily coated with loose rust scales.

  "2. Light oil film and oil residue under flanges of beams, brackets, intercostals, and bottoms.
  "3. Water around suctions.
  "4. No drain well boxes over suctions."

This dispute arose upon libelant's attempt to collect for the work it performed on the Tabriz. Libelant now contends, after trial of the case, that the contract to clean the cargo tanks of the Tabriz was made with Captain Roeggen, master of the vessel, rather than with Guthrie, as was originally alleged in the libel.

Respondent, who is the owner, contends that if the contract was made with the master of the vessel, as libelant now insists, then respondent is entitled to a dismissal of the libel as a matter of law. This is because the master under the circumstances had no authority to order this work.

Libelant, however, argues that the master of a vessel has the authority to bind the vessel on contracts for necessaries furnished in a foreign port, so that the person furnishing such necessaries may recover their value in an action in rem against the vessel.[2] It is contended that the authority of the master to bind the vessel pursuant to this statute has long been recognized.[3] Libelant concludes, therefore, that the master of the Tabriz, Captain Roeggen, had authority to enter into the contract in question with libelant.

Respondent, on the other hand, contends that the master's authority to bind the vessel on such contracts arises only through necessity and where, as here, there is a local agent representing the owner of the vessel then in port, the local agent is the only one authorized to order necessaries for the vessel. Respondent argues that libelant had a duty to inquire as to the master's authority before entering into such a contract especially where libelant had knowledge of the agency of Guthrie and Talabot.[4]

Resort should be had at this point to Section 973 of the Maritime Lien Statute.[5] This section defeats a lien where the furnisher of necessaries knew, or by the exercise of reasonable diligence could have ascertained, that the person ordering said necessaries was without authority to bind the vessel therefor.

---

2. Provisions of the Maritime Lien Statute 46 U.S.C.A. §§ 971 and 972 are relied upon by libelant.

"§ 971. Persons entitled to lien

"Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

"§ 972. Persons authorized to procure repairs, supplies, and necessaries

"The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel."

3. Libelant cites:
Piedmont & George's Creek C. Co. v. Seaboard Fisheries Co., 254 U.S. 1, 41

S.Ct. 1, 65 L.Ed. 97; South Coast S.S. Co. v. Rudbach, 251 U.S. 519, 40 S.Ct. 233, 64 L.Ed. 386; Benedict on Admiralty (6th Ed.) § 2, p. 19; 48 Am.Jur., Shipping, §§ 119, 122, 123, 132.

4. Respondent cites:
St. Louis Ship. & S. Co. v. First Nat. B. & T. Co. of Vicksburg, D.C., 179 F. Supp. 847, affirmed 5 Cir., 287 F.2d 366.

5. 46 U.S.C.A. § 973.
"§ 973. Notice to person furnishing repairs, supplies and necessaries

"The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

It will be noted that under this section an essential element in barring the creation of a lien is the lack of authority in the person ordering the supplies or services.

■ An examination of the evidence in the instant case reveals no such lack of authority in the master of the Tabriz. There is nothing in the charter party [6] which expressly denies him the authority to create liens. Absent such express denial of authority in the charter party, the owner is liable for the liens created by the master. [7]

■ The case cited by respondent (note 4, *supra*) relates to the duty of inquiry required of the furnisher of necessaries. However, in that case a request to see the charter party would have disclosed that the master was expressly prohibited from liening the vessel. A similar inquiry in the case at bar would have disclosed no such fact. It is immaterial, therefore, whether or not McNamara made such inquiry since the lien is not defeated unless the master is explicitly denied authority to bind the vessel. [8]

■■ Nor does McNamara's knowledge of the agency of Guthrie and Talabot defeat libelant's claim. The fact that the owner has agents in addition to the master of the vessel does not preclude the existence of authority in the master, nor does it destroy the statutory presumption of such authority. [9]

■■ The evidence supports a finding that the contract for cleaning was made between McNamara and Captain Roeggen as master of the vessel. [10] Captain Roeggen had authority to make such a contract on behalf of the owner. Respondent's claim that the contract was between McNamara and Guthrie is unconvincing particularly in view of Gibson's testimony that the firm had no authority to hire cleaners, and also Helberg's testimony to the effect that the cleaning job was given at the time the Captain agreed with McNamara.

■ The evidence also supports a finding that the contract was made under the terms testified to by McNamara. It was agreed that libelant would handle the cleaning of the tanks for cost plus 18%, and would attempt to complete the work by a certain time. The evidence shows further that the cleaning operation was delayed through no fault of libelant when water from some of the tanks containing ballast leaked into tanks which had already been cleaned making is necessary to repeat some of the work previously completed. Libelant was prevented from completing the contract when he was ordered off the vessel by Guthrie. Under these circumstances, where libelant was prevented from completing the contract, resort to general principles of contract law indicates that libelant may recover on a quantum meruit for the reasonable value of the work performed whether it is of value to respondent or not. [11]

■ The testimony of the general manager of Twin Ports Cleaners, the firm called into complete the cleaning

6. Respondent's exhibit AAA.

7. South Coast S.S. Co. v. Rudbach, supra note 3; The Golden Gate, 9 Cir., 52 F.2d 397; The J. W. Hennessy, 2 Cir., 57 F. 2d 77; The Everosa, 1 Cir., 93 F.2d 732; Hercules Co. v. The Brigadier General Absolom Baird, 3 Cir., 214 F.2d 66; The City of Helena, D.C.Mo., 25 F.Supp. 864.

8. South Coast S.S. Co. v. Rudbach, supra note 3; Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197; Hercules Co. v. The Brigadier General Absolom Baird, supra.

9. 46 U.S.C.A. § 972, supra note 2.

10. Libelant's exhibit 1 is an invoice for the cleaning work performed by libelant aboard the Tabriz. Attached is a labor form which states "Description Of Work Performed At The Request Of The Undersigned." Under the words, "Approved for Steamship Company or Agent" appears the signature of Captain Roeggen as "Signature of Representative."

11. 17 C.J.S. Contracts §§ 469 and 511; 12 Am.Jur., Contracts § 346.

job, convinces the court that libelant's charge was reasonable. The total amount prayed for by libelant is $4,725.70, including the sum of $84.08 for guard services provided for the Tabriz by libelant at the request of Guthrie. Libelant is entitled to the total amount prayed for in the libel.

◼ In view of the finding that libelant was not negligent in the performance of the cleaning contract, the owner is not entitled to the damages ($7,200.00) sought in the first cause of action of the cross-libel and attributed to alleged negligence on the part of libelant.

There remains to consider, therefore, the claim for damages in the sum of $200.00 set forth in the second cause of action of the owner's cross-libel and arising out of the guard service provided for the Tabriz by libelant.

It is undisputed that watchman service for the Tabriz was furnished by libelant upon the request of the Guthrie firm. This service, which was furnished while the Tabriz was in the Port of Duluth, commenced at 11 a. m. on June 14, 1960, and ended at 4:30 p. m. on June 15, 1960. The watch was divided into four successive shifts of approximately eight hours each with one guard provided for each shift. The necessity for guard service appears to have arisen out of the fact that the entire crew of the Tabriz had been detained on board the vessel pursuant to an order of the United States Immigration Service.[12]

It is also undisputed that sometime between 11 a. m. and 7:30 p. m. of June 14 while the guard provided by libelant was on duty, one of the crew of the Tabriz left the vessel. How this was accomplished does not appear in the evidence. Nevertheless, a fine of $200.00 was paid by the owner to the Collector of Customs at Duluth for failure to comply with the above order.

The cross-libel alleges negligence and breach of contract in permitting the escape and seeks damages in the amount of the fine paid by the owner. It is conceded that libelant is entitled to the $84.08, which is the charge for the guard service, as an offset against the $200.00 fine paid by the owner.

◼ Cross-libelant contends that these facts are sufficient to justify a finding of negligence and breach of contract on the part of libelant.[13] The Ring case, relied upon by cross-libelant, involved facts similar to the instant case. However, in the Ring case there were five watchmen on duty at the time of the escape. In addition, there was evidence relating to the means of egress from the ship, the location of the guards during the watch, the instructions given to the watchmen by the ship's officers, and also evidence relating to the use of passes by those leaving the ship. There was evidence, therefore, upon which a finding of negligence could be made. On the other hand, there is insufficient evidence in the instant case to support such a finding. Cross-libelant has failed to carry his required burden of proof and the relief sought in the second cause of action of the cross-libel must be denied.

Therefore, libelant is entitled to the amount prayed for in the libel, whereas cross-libelant is denied the relief sought in both causes of action of the cross-libel.

Libelant may submit findings of fact, conclusions of law, order for and form of judgment consistent with the foregoing.

It is so ordered.

Respondent-cross-libelant may have an exception.

12. Respondent's exhibit Q.

13. Citing:
Ring v. The Dimitrios Chandris, 3 Cir., 133 F.2d 124.